(No. 27978.— )
*In re* WILLIAM WALLACE MCCALLUM, Attorney,
Respondent.

*Opinion filed March 21, 1945—Rehearing denied May 21, 1945.*

WILSON, J., took no part.

CHARLES LEVITON, *amicus curiae.*

BARRETT, BARRETT, COSTELLO & BARRETT, of Chicago,
for respondent.

WILLIAM WALLACE MCCALLUM, *pro se,* on rehearing.

Mr. JUSTICE SMITH delivered the opinion of the court:

The Board of Managers and the General Committee on
Grievances of the Chicago Bar Association, acting as com-
missioners under Rule 59 of this court, filed a report in

this court recommending the disbarment of respondent, William Wallace McCallum. He has brought the record here for review, upon objections and exceptions to the report. The record is voluminous. More than sixty witnesses were examined and numerous exhibits were admitted in evidence.

The commissioners found respondent guilty of fraudulent dealings with his clients, and overreaching them in obtaining contracts of employment, and in his settlements with them in cases he had handled for them in at least nine different cases.

The record shows that respondent was admitted to the bar of this court on April 4, 1907; that his practice consists largely of personal injury and death claims; that he appears in court on motions, takes an active part in the preparation of cases and assists in the trials, but employs trial counsel to conduct the trials. His activities in obtaining clients extend into several States.

The findings as to his conduct in overreaching clients in obtaining contracts of employment and in his settlements with them, are based upon the findings of the commissioners, which are amply sustained by the evidence, that when he would obtain a client he would usually keep him in a hotel or hotels in Chicago, pay his expenses, including hotel bills, hospital bills, physicians' bills and court costs and other expenses. He would also advance money to his clients from time to time. His practice was that when he would make an advancement or loan to a client, he would take the client's note. He testified that when he would make an additional loan or advancement, he would destroy the existing note and take a new note for the increased amount. When the final settlement was made with the client, the last note would be paid, but, in each instance, respondent retained the note in his possession. He never delivered a cancelled note or copy of an employment contract to the client.

In numerous cases, it is shown by the evidence in the record, there were controversies concerning the amount of fees to be charged, and which respondent deducted from the settlements received in payment of the claims on the final settlement. In each case, however, on the trial of this cause, respondent produced a contract of employment, signed by the client, corroborating him as to the percentage of the amount realized on the claim, which was to be paid to him for his fees. He also produced the last note taken from each client for the amount that he claimed was the aggregate of the advancements made by him. Many of the clients testified positively that they had a definite agreement that the fees would be $33\frac{1}{3}$ per cent. They further testified that they had no knowledge or recollection of signing a contract such as the one produced by respondent. In each instance, however, the genuine signature was attached to the contract, usually providing for fifty per cent of the recovery. The clients testified that when they made verbal agreements with respondent as to the amount of his fees, they were asked either by respondent or his secretary, to sign a paper which, it was explained to them, was necessary to permit them to obtain, from the Interstate Commerce Commission, a copy of the report of the accident in which the client was involved; that they signed the paper as requested, without reading it, and had no knowledge of what it was or that it was a contract of employment. It is obvious from the record that this was the method respondent employed to get the signatures of clients to the contracts for a contingent fee of fifty per cent of the money realized from the claims. Most of his clients were unsophisticated and inexperienced in legal and business matters. Naturally they would not hesitate to sign any paper presented to them by the attorney they had employed, without knowing what they were signing, upon this plausible explanation made, without reading or questioning the character of the paper or the propriety of sign-

ing it. Respondent and his secretary denied that such statements were made, or any papers signed or requested for the purpose of obtaining copies of records of the Interstate Commerce Commission.

In most of the cases, when the final settlement came there was a controversy concerning the amount of the fees and advancements. In several cases, settlements were delayed until the client employed another attorney to enforce settlement by respondent. In some cases suits were brought against him. In some instances no settlements were made until the client had filed a complaint with the bar association. The record shows that in some cases the clients were so hard pressed financially that they were willing to accept any amount respondent offered them and, under the lash of necessity, were willing to sign any papers which he requested, in order to get a settlement and obtain whatever amount respondent would give them.

The evidence concerning the signing of contracts and the settlements is extremely conflicting. It cannot be reconciled. Either the clients testified falsely or respondent and his secretary, who was his chief witness in every case, testified falsely. It seems not at all likely that a dozen or more former clients, widely scattered and coming from several different States, and apparently having no acquaintance or relations with each other, would all testify substantially to a similar state of facts relative to the contracts of employment and the controversy relative thereto on their settlements with respondent, if the facts to which they testified were untrue. Nevertheless, we shall not undertake to reconcile the testimony concerning these matters, or to determine wherein the truth lies. For the purposes of this opinion, we may pass over all of the charges that respondent was guilty of fraud in obtaining the contracts and in dealing with his clients, and that he overreached them in procuring their signatures to contracts, in procuring their notes for moneys advanced to them, and in the final settle-

ments. The opinion in this case, as we view this record, may be properly limited to the charges that respondent was guilty of soliciting cases through solicitors or "investigators." Hence, we will confine this opinion to that branch of the case.

Respondent was before this court in 1930, in *People ex rel. Chicago Bar Association* v. *William Wallace McCallum*, 341 Ill. 578. In that case it was said: "The offense of the solicitation of business charged against respondent is not one which imports, neither does the evidence produced in support thereof show, venality, criminality, fraudulent practices or moral turpitude on his part. We are of the opinion that while the circumstances of this case are not such as call for the disbarment of respondent yet they cannot lightly be passed over. Conduct such as respondent's in soliciting business is deserving of severe censure by this court, and persistence therein would justify disbarment."

While respondent in that case was let off with a censure for his conduct, he was admonished and warned that persistence in the practice of soliciting cases would justify his disbarment. In this case the commissioners found him guilty on a number of charges of soliciting cases. Much evidence was offered touching these charges and there is much conflict in the evidence concerning them.

Edward P. McEvoy testified that after he received an injury and while he was in the hospital at Geneva, Pennsylvania, respondent's agent, Abel, called on him and solicited him to employ respondent. It is admitted that Abel was respondent's employee at that time. He also testified that he was present when one Thurston Guthrie, another employee of respondent, solicited Mrs. Van Pelt at Cleveland, Ohio, to employ respondent to bring a suit for her to recover for the death of her husband, who was injured in the same accident as McEvoy. McEvoy further testified that, after his case was disposed of, respondent offered

him a job as a "runner;" that respondent gave him a printed blank for his expense account on which the expenses were to be itemized in great detail. This blank was produced by the witness and admitted in evidence. Respondent denied this conversation and giving the witness the blank. He also produced Mrs. Van Pelt who testified that she was not solicited by anyone.

Respondent's testimony as to his employment by Edward McEvoy is that, prior to his injury, his brother, John McEvoy, had retained respondent to represent him in a claim for damages; that this matter was pending at the time Edward McEvoy was in the hospital; that at the request of John McEvoy, respondent directed Abel, his employee, to call on Edward McEvoy at the hospital. By direction of respondent, Abel later brought McEvoy to respondent's office. Neither Abel nor Guthrie was called as a witness. Respondent also offered in evidence an elaborate and extensive affidavit upon which the signature of Edward McEvoy appeared following each paragraph. This affidavit set out in detail the manner in which the employment of respondent by McEvoy was brought about. It further states that no one solicited McEvoy to employ respondent and that he first heard of respondent through his brother, John McEvoy, whom respondent represented at that time. It seems to have been the custom of respondent to obtain from each client an affidavit that he was not solicited to employ respondent to represent him. In view of the evidence in the record as to the manner in which such affidavits were obtained, this custom was, in itself, significant.

John McEvoy, a brother of Edward, testified that he was injured in April, 1937; that Abel, the same employee of respondent referred to by Edward McEvoy, came to the hospital and solicited him to employ respondent; that Abel asked him to accompany him to see another party who had been injured. Thereafter Abel took him to Chi-

cago to see respondent. After John McEvoy's case was settled, he testified that respondent offered him $1800 per year and expenses, to work for him as a "chaser;" that he gave him two blank forms on which to keep his expense account; that respondent told him that Abel made about $7000 that year; that if he, John McEvoy, brought respondent cases, he could do better.

Respondent produced a letter from one W. J. Hartle, alleged to be a former client of respondent, advising that John McEvoy had talked to Hartle about his injury and said that he wanted to employ Hartle's lawyer and wanted to hear from him as soon as possible. Hartle also testified substantially as stated in the letter. Respondent also offered an affidavit signed by John McEvoy and sworn to before respondent's secretary that he was not solicited to employ respondent. It should be noted in this connection that nowhere in the affidavit is W. J. Hartle mentioned, who, respondent claims, is the man who first referred John McEvoy to him. The letter purporting to be from Hartle is dated June 16, 1937. The affidavit of John McEvoy is dated July 15 of that year.

Charles Swaebly lived at Bellevue, Ohio. He testified that on July 13, 1938, he met respondent at the residence of James Fehl in Bellevue; that respondent at that time was accompanied by Thurston Guthrie; that respondent and Guthrie solicited him to employ respondent, which he did. He testified that after his case was settled he returned to Chicago; that respondent, at that time, told him that witness "could work for him the same as Jim Fehl, get cases for him and bring them down to Chicago;" that respondent said witness would be paid $150 per month and expenses, and $100 extra for each client he obtained.

To rebut this testimony, respondent offered in evidence a letter dated July 7, 1938. The letter is addressed to respondent and is in Swaebly's handwriting and signed by him. It states that respondent had been recommended to

. Swaebly; that Swaebly had recently sustained an injury while employed by a railroad company; that he would like to have respondent come to see him. Both respondent and his secretary testified that this letter was received through the mails in due course following July 7, 1938. Swaebly testified on cross-examination that this letter was written by him in December, 1938; that respondent's secretary gave him a typewritten letter in the same language and had him copy the typewritten letter in his own handwriting, and date it July 7; that she told him that all clients did that, so he did the same thing. This is a question of veracity between respondent's secretary and Swaebly. Respondent testified that it was in response to this letter that he went to Bellevue, Ohio, to interview Swaebly about his case.

Respondent also called Fehl as a witness, who testified he had been acquainted with Swaebly for fifteen years; that Swaebly asked him to write to respondent requesting him to call on Swaebly. He denied the testimony of Swaebly that Fehl told him if Fehl got his case for respondent, he would get $100 for it, and denied that he was ever employed by respondent.

Ethel Allensworth lived with Winn Allensworth, her husband, in Gladwin, Iowa. They both testified that on July 21, 1933, there was a railroad wreck which damaged their store and home and injured Mrs. Allensworth; that in November of that year, one Harley Cherwinker asked them to go to Chicago and give their cases to respondent; that later Cherwinker drove them to Chicago and accompanied them to respondent's office; that in December, 1933, Cherwinker again took them to respondent's office in Chicago. The husband testified that on that occasion he saw respondent give Cherwinker some money; that Cherwinker told him it was $100.

Cherwinker was called as a witness by respondent. He testified that he had sustained an injury himself before

the train wreck; that he had been to Chicago after the train wreck on account of his claim; that he told Allensworth who his lawyer was; that Allensworth wondered if respondent would take his case; that he told him he did not know, but would find out and let him know; that he did talk to respondent about the Allensworth cases, and on his next trip to Chicago he took the Allensworths in his car to respondent's office. He testified he paid the expenses of the trip himself. When asked if he had been reimbursed, he said, "I still got it coming."

Respondent testified that he was representing Cherwinker in 1933, as his attorney; that on one of his trips to respondent's office, he told respondent about the Allensworths; that they wanted somebody to advise them and had asked Cherwinker to bring them to see respondent. He denied paying any money to Cherwinker for expenses. While the Allensworths employed respondent; they became dissatisfied with the way the case was being handled, and later discharged him.

Harl Brown testified that, after he had received an injury, one Ed Raub talked to him about his case; that later, Owen Stiles came to his home; that Raub had told him before that he wanted Stiles to talk to him; he testified that Stiles showed him some newspaper clippings giving accounts of big settlements that had been made by respondent; that Stiles solicited him to let the attorneys come and see him about his case; that Stiles mentioned respondent; that the next day Stiles brought respondent and his brother, James McCallum, to his home in Garret, Indiana; that he, thereupon, signed a paper, which was stated by respondent to be an "Inquiry from the Interstate Commerce." Harl Brown's wife testified to substantially the same facts. Proof was offered showing that Raub died before the hearing. James McCallum also died before the hearing.

Respondent admitted calling on Brown; that he took a contract from Brown at Brown's home. He further testified that Stiles, who was investigating for him, lived at Garret, Indiana, the same town in which Brown resided; that Stiles told him Brown wanted to see him in regard to his case and that Stiles drove respondent to Garret for that purpose; that Brown told him that an old friend of his named Raub had told him about respondent collecting some money for a man by the name of Stiles. Respondent further testified that he had represented both Stiles and his brother prior to that time, but that he had never known Raub. He testified on cross-examination that Owen Stiles had been working for him about a year and a half; that he learned of Brown through Stiles and called on Brown at the request of Stiles.

Owen Stiles was called as a witness. He testified that he was a boilermaker by trade; that at the time he testified he lived in Chicago; that he engaged in soliciting personal injury cases for respondent from sometime in the year 1936 to April, 1937; that he was again so engaged for about two years after June, 1939; that he also ran errands for respondent; that up to April, 1936, he was given a drawing account of $100 per month; that he was then increased to $200 per month, and expenses; that he asked both respondent and his brother about a commission on the Ward case; that respondent said he could not get that until the end of the year when they straightened up the books; that later he was raised to $250 per month. He further testified that after he had been out of respondent's employ for a while, he again went back to work for him, soliciting cases; that he worked for respondent during three different periods; that he knew Harl Brown; that he had Raub to first go and solicit Brown's case for respondent; that he was then working for respondent and reported everything to him; that he also told respondent he could get a man to help out on Brown's case,

(meaning Raub,) and that if he got it, "we would give him $100." To this respondent replied, "You are out for the business. Go after it." He further testified that he and Raub then talked with Brown and induced Brown to let Stiles bring respondent to see him. Stiles further testified that, during the period he worked for respondent, he was given names of clients to see; he was given by respondent, or his brother James, photostat copies of various checks payable to clients respondent had represented. He produced six such checks, which are in the record. These checks show payments on settlements in amounts ranging from $14,975 to $22,500. He testified that respondent told him to show these photostats to prospective clients, to use them for advertising purposes; that he carried the photostat. copies with him and used them in soliciting cases while he was employed by respondent; that he later brought them to the Chicago Bar Association after he had some difficulty in the settlement, with respondent, of his brother's case.

Respondent produced and offered in evidence an affidavit executed by Stiles, dated November 7, 1941, in which he denied at great length and in great detail the solicitation of clients for respondent. Respondent also produced a letter dated January 12, 1937, addressed to the Chicago Bar Association, signed by Stiles. In this letter, after referring to a complaint he had made on January 6, 1937, to the bar association concerning the conduct of respondent, he stated that a settlement had been made between his brother and respondent which was satisfactory to him; that his statement in the complaint which he had filed on January 6, 1937, that he had solicited business for respondent was erroneous and that he desired to withdraw the charges.

Stiles's explanation of this affidavit and letter is interesting. He testified that, on the date the affidavit was made, he had a conversation with respondent in his office

in which respondent stated that he knew that he owed Stiles some money and wanted to pay him, but that he could not do so unless Stiles would sign papers that he had never solicited cases for respondent; that thereupon he signed the affidavit; that respondent at that time paid him $550. Stiles is corroborated, in part at least, by his bankbook showing a deposit in the La Salle bank of $550 on the day following the date of the affidavit, which he testified was the money he received from respondent. With reference to the letter of January 12, 1937, Stiles testified that there was a dispute between him and respondent at that time; that respondent was supposed to give him ten per cent of the amount collected on a certain case; that Henry Bay, one of respondent's employees, gave a typewritten letter to him dated January 12, 1937, addressed to the bar association, which, at the request of Bay, Stiles copied in his own handwriting and gave to Bay, whereupon he was paid the sum of $320 in respondent's office.

Adolph Reif testified that he was injured in March or April, 1931; that a man by the name of Joseph Sanders called on him. As a result, he was taken to respondent's office by Sanders and one Charles Flake; that he had known Sanders for six or seven years, but did not ask Sanders to make contact with respondent for him. Respondent testified that Sanders was a former client of his, but had not worked for him; that he paid Sanders no money for introducing Reif. Sanders also testified, denying the solicitation of Reif's case for respondent. It appears from Sanders' cross-examination that he had had difficulty with respondent and had brought a suit against him; that the case was tried and was won by respondent; that he had made a complaint to the bar association against respondent. He was shown the complaint on cross-examination. While he admitted the letter was in his handwriting, he stated that the facts therein stated were untrue. He vacillated in his testimony and left the facts

concerning which he testified in considerable doubt. His memory seemed to be conveniently bad. When he was confronted with the statements which he had · made to John Bloomingston, his attorney, with reference to his suit against respondent, which were taken in shorthand and transcribed in Bloomingston's office, and in which he had told about soliciting cases for respondent, he answered he could not remember whether he made those statements to his attorney or not; that if he did they were not true. His attention was then called to certain answers he gave to questions propounded to him as a witness on the trial of his case against respondent, by his attorney, Bloomingston. It appears that he testified in that case that respondent had asked him repeatedly to go out and talk to other people who had been injured. As a witness in this case, however, he answered that that testimony was not true and that he was drunk when he testified. He denied other statements made by him in his testimony in the trial of his case against respondent, with the statement that they were untrue.

The record, therefore, shows that Reif testified· that Sanders solicited his case for respondent. Sanders himself so stated to John Bloomingston, his attorney, in response to questions propounded to him by Bloomingston. Sanders gave like testimony as a witness in court in his suit against respondent. He voluntarily made the same statements in his complaint to the bar association. Nevertheless, as a witness in this case he denied that he had solicited the Reif case, or any other cases. · His testimony is not impressed with the earmarks of truth.

William P. Sullivan was injured in July, 1931. He testified that a man he knew as Harry Malloy called on him. He testified that Malloy, whose name he afterwards· learned was Springer, talked him into going down to see respondent about his case, and accompanied him to respondent's office. There, he was introduced to respondent

and talked over his case. He employed respondent. He was introduced to Charlie Flake by respondent and taken by Flake to a hospital. He testified that, during the time his case was being handled by respondent, respondent requested him to see another injured person and explain to him how successfully his case was being handled and "to persuade the case—persuade me to get the case;" that respondent told him he would get $250 if he got the case of a man whom the witness knew only as "Bumbo" living on Walton avenue in Chicago, whose case he was asked by respondent to solicit. Respondent, however, produced a man who said his name was Melvin Nicholas Springer but that he sometimes went under the name of Harry Malloy. Springer testified that he was working with Sullivan when Sullivan was injured; that Sullivan asked Springer if he knew a lawyer. Springer told him he knew respondent and his brother and made an appointment with respondent to see him.

Mary B. Sevier testified that she lived in South Pekin, Illinois; that her husband died as a result of an accident on May 21, 1937; that a man by the name of Guthrie, whom she had never known before, came to see her the second week after her husband's death; that he told her how he could, through respondent, get her a large sum of money, and asked her not to say anything to anyone about it. She testified that Guthrie took her to Chicago in his car; that she went to respondent's office with Guthrie; that respondent showed her several photostat copies of checks made out to other people, which, he said, he had secured for them. She testified that she ultimately signed a contract employing respondent, at the request of Guthrie, in August, 1937, at her home in South Pekin, Illinois. She returned to respondent's office on several occasions. He finally insisted that she settle her case for $1200, which she refused, and thereupon severed her relations with respondent. It is to be noted that she signed the

contract of employment at Guthrie's request, at her home in South Pekin, when respondent was not present. Mrs. Sevier's testimony as to the photostat copies of the checks was denied by respondent and his secretary. The secretary, however, admitted that Guthrie, with her knowledge, went down to South Pekin to bring Mrs. Sevier to Chicago. Respondent's testimony as to this matter was that one Oscar Jolly, a former client, and who, he claims, was a friend of Mrs. Sevier's husband, told him about the husband's death, and that Mrs. Sevier had asked Jolly to get in touch with respondent; that as a result of this he sent Guthrie after her. The contract of employment signed by Mrs. Sevier was admitted in evidence. Guthrie's name does not appear on this contract. The name of "Edward L. Richter" appears thereon as a witness to the signature of Mrs. Sevier.

Without extending this opinion to set out in detail their testimony, other witnesses gave similar testimony to the effect that their cases had been solicited by employees of respondent. In each instance such solicitation was denied by respondent. In most cases he offered evidence which, if true, tended to corroborate him in such denials.

One other specification of misconduct deserves notice. This is a complaint filed with the Chicago Bar Association by the bar association of Clinton county, Indiana, charging respondent with soliciting cases through his employee. A transcript of the proceedings in the case of State of Indiana v. Clyde Hoffman, in the circuit court of Clinton county, Indiana, was admitted in evidence without objection. From this transcript it appears that on December 22, 1933, an indictment was returned against Hoffman in the Clinton circuit court charging him with soliciting cases in violation of a statute of that State. The particular charge was that Hoffman had solicited one Ross L. McIntosh in Clinton county, Indiana, to employ respondent as his attorney. The cause was tried before a jury. Re-

spondent appeared and testified in that case. The record shows that he was greatly interested and took an active part in the defense of Hoffman. The jury found Hoffman guilty as charged. Respondent testified that at the time of the alleged offense Hoffman was employed by him as an investigator.

Judge Laymon, who, at that time, was the judge of the circuit court of Clinton county, Indiana, and presided at Hoffman's trial, testified in this case that after the verdict was returned and while the motion for a new trial was pending, respondent called him by telephone and told him in substance that respondent planned to take a trip to Florida and asked Judge Laymon if he would be interested in accompanying him to Florida, that, if he was, respondent would pay all the expenses. Respondent, while admitting he had a telephone conversation with Judge Laymon at that time, denied that he offered to pay his expenses on a trip to Florida.

Three downstate city judges and one Chicago judge, a railroad claim agent residing in St. Louis, Missouri, and the manager of the building in which respondent maintained his offices testified to his good reputation. While proof of good reputation is always an element to be taken into consideration, it is no defense to specific acts of misconduct. *People ex rel. Chicago Bar Ass'n v. Johnson,* 344 Ill. 132.

From this mass of conflicting evidence, certain definite and practically uncontroverted facts are clearly shown. Subsequent to the date on which the opinion was filed in the former case, respondent had in his employ Stiles, Guthrie and others, referred to by respondent as "investigators." It is undisputed that these employees, with respondent's knowledge, solicited cases for him; that they operated in several States; that on numerous occasions they took cases and prospective clients to respondent and respondent's office; that respondent entered into contracts

of employment with such clients and handled their cases. In one case, that of Mrs. Sevier, Guthrie himself took the contract, employing respondent, in her home in South Pekin. Respondent admits sending Guthrie to see Mrs. Sevier and that he brought her to his office.

Stiles, one of respondent's employees, was called as a witness. He testified that he was employed by respondent as a "chaser" to go out and solicit cases for respondent. These investigators, so-called, were paid regular salaries and their expenses. Clients in many cases were brought to Chicago and placed by respondent under the surveillance of some of these investigators while their cases were pending and until settlements were made.

The proof is conclusive that the principal business and activities of such investigators was the solicitation of cases for respondent, regardless of the tendency of some of the evidence in the record to support the claim of respondent to the contrary. The evidence in the record favorable to respondent consists largely of the testimony of himself, some of his investigators, his secretary, and records made by him and under his control. The manner in which some of the letters and affidavits, offered in evidence by respondent, were prepared and the signatures thereto obtained has already been referred to. The character of such records themselves and the testimony as to the time and manner in which they were prepared, and the signatures thereto obtained, materially detract from their probative force. One of his solicitors was convicted in Indiana of soliciting cases in violation of a statute of that State. He admits that this solicitor was employed by him at the time the charge was made against him, and that he continued to employ him for several years after his conviction.

From a careful examination and consideration of all the evidence in the record, the conclusion is inescapable that, after the opinion in the former case was filed, respondent made little, if any, change in his practices in the

securing of cases from those condemned in the opinion in that case, and for which he was censured. The admonition was there given him that a continuance of such practices would result in his disbarment. Obviously, the censure administered to respondent in the former case and the warnings given by that opinion have not had the desired effect. Such disregard of that admonition and warning by respondent, as is shown by the evidence in this case, cannot be condoned. Such conduct in violation of the definite warning of this court shows venality, criminality and moral turpitude. Respondent has clearly demonstrated that the only way to prevent him from engaging in such practices is to strike his name from the roll of attorneys. His conduct, as shown by this record, is unprofessional, unethical and dishonorable. It denotes a lack of good moral character and tends to bring the profession of the law and the administration of justice into contempt and disrepute. It is clearly the duty of this court to strike his name from the roll of attorneys. The finding and report of the commissioners is approved. The rule is made absolute and respondent's name is stricken from the roll of attorneys of this court.

*Respondent disbarred.*

Mr. Justice Wilson took no part in the consideration or decision of this case.

On rehearing the following additional opinion was filed:

Per Curiam: On rehearing respondent, for the first time, argues the point that he has been deprived of due process of law because the evidence against him was presented to a committee of the Chicago Bar Association, which, since 1933, has acted as commissioners of this court, in disciplinary proceedings brought against attorneys at law. (See Rule 59.) The contention is that the members of the committee on inquiry and commissioners were preju-

diced against him. This point was not argued when the merits of the case were presented to this court, although it is true that in the year 1941, at the time the proceeding was initiated by the Chicago Bar Association, he made a motion in this court to have the evidence heard and recommendations made by persons who were not members of the Chicago Bar Association.

The statutes of Illinois provide no means of defraying costs of taking evidence or compensating for the time of persons acting as commissioners in proceedings for disbarment. This court, taking cognizance of numerous unethical practices of lawyers in large cities and knowing the high ethical standards required to become a member of the Chicago Bar Association, delegated to this organization the power to appoint committees of inquiry and to take testimony and report evidence of misconduct upon the part of lawyers, and to make recommendations to this court whether, in such case, to discipline or discharge the respondent.

The recommendations made are purely advisory and this court acts only after an examination of the evidence in the case, except where no answer is made by respondent, and in these cases the charges and supporting evidence are examined before action is taken by this court.

In the present case the motion of respondent for a change of personnel to take and report the evidence was presented to this court, but in view of the fact that we examine the testimony reported, the motion of respondent was denied. However, this would not authorize the committee selected to take the evidence to deprive respondent of any rights by unfair, irregular or arbitrary acts or rulings in receiving or rejecting testimony. We have examined with care the evidence reported and the rulings of the committee, and find no irregularity or capricious or arbitrary acts upon the part of such persons in the hearing, or any deprivation of any substantial right of respondent

to bring all proper evidence before us. The conclusion we have reached is based entirely upon the evidence in the record and not upon the findings or recommendations of the commissioners. The respondent has had the same hearing in this case as if the testimony were taken by a nonmember of the Chicago Bar Association or by a member of this court. The point raised by respondent, for the first time on rehearing, has been given particular attention and consideration. The evidence, to our minds, clearly establishes that respondent has been guilty of unethical practices. The respondent, however, is entitled to preserve the point he has raised on rehearing, because, for purposes of this kind of a case, this is a court of initial hearing, and the commissioners are merely agents for the purpose of gathering and reporting the evidence.

It is therefore ordered that all matters and proceedings in this case not heretofore made a matter of record be made a part of the record in this cause. The motion for rehearing and for vacation of judgment is denied, and the original judgment of disbarment sustained.