Thomas M. Morris, Appellee, v. Pennsylvania Railroad Company, Appellant.

Gen. No. 46,732.

First District, Second Division.
April 24, 1956.
Rehearing denied May 15, 1956.
Released for publication May 15, 1956.

Robert H. Bierma, P. J. Cronin, Arthur L. Foster, and Charles F. White, all of Chicago, for appellant; Edward J. Fleming, of Chicago, of counsel.

Thomas M. Morris, of Chicago, for appellee; Henry E. Saks, of Chicago, of counsel.

JUDGE ROBSON delivered the opinion of the court.

This is an action by 'Thomas M. Morris, petitioner, to enforce an attorney's lien for fees by virtue of an alleged contract with one John W. Shultz, which petitioner claimed entitled him to one-third of the amount of a $40,000 settlement that the respondent had made with Shultz after petitioner had been discharged as his attorney. The respondent defended on the ground that the contract was obtained by solicitation. After a bench trial the court entered an order sustaining the petition and entering judgment against respondent for the sum of $13,333.33. Appeal was taken from this judgment order.

■ If petitioner's contract of employment was obtained through solicitation, it is void and unenforceable. The opinion in Atchison, T. & S. F. Ry. Co. v. Andrews, 338 Ill. App. 552, 88 N.E.2d 364, where leave to appeal was later denied by the Supreme Court, is extremely illuminating on this subject. Andrews, whose name was stricken from the roll of attorneys after the case had been decided, was there enjoined, together with two other defendants, from soliciting the claims of injured employees of two railroad companies through ambulance chasers. The court there said at p. 567:

"Barratry, champerty and maintenance were offenses at common law. Each is malum in se. (Gilbert v. Holmes, 64 Ill. 548, 555; Geer v. Frank, 179 Ill. 570, 574.) The public policy of Illinois against fomenting and maintaining litigation is declared by the statutes and decisions of our courts. Paragraphs 65 and 66, chap. 38, Ill. Rev. Stat. 1947 [Jones Ill. Stats. Ann. 37.040, 37.041], makes barratry and maintenance unlawful . . . . The same public policy is declared in the statutes of California, Arizona and New Mexico. The evidence in support of the charges of champerty and maintenance shows a brazen contempt for the law, legal ethics, and the rights of plaintiffs."

See also Puls v. Chicago & N. W. Ry. Co., 233 Ill. App. 625; Brink's Inc. v. Gravesen, 309 Ill. App. 571, 33 N.E.2d 497; People v. Berezniak, 292 Ill. 305, 127 N. E. 36; Ingersoll v. Coal Creek Coal Co., 117 Tenn. 263, 98 S. W. 178, 9 L. R. A. (N. S.) 282. In order to decide this issue it is necessary for us to review the evidence.

Petitioner was his only witness. He testified that he has practiced law in the State of Illinois since 1926. In November 1953 petitioner while on his way to Connecticut stopped at Fort Wayne, Indiana. There he met one James F. Forbes, a friend of his for thirty years, whose residence was in Lawrence, Michigan. Forbes did not appear in the case as a witness, and it is not shown what his vocation was. However, from the record he appears to have been the contact man for petitioner in at least two personal injury cases; that of Leland L. Hart and John W. Shultz. It does not appear from the record how the meeting between Forbes and petitioner was arranged. In any event, Forbes met with petitioner and they went to the Keenan Hotel where Forbes introduced him to Hart. Petitioner had had some correspondence with Hart pertaining to a claim which Hart had settled with respondent. Hart, Forbes and petitioner discussed

26

Hart's case. In the course of the discussion it was mentioned that John W. Shultz, an employee of respondent who lived in Fort Wayne, had been injured. Forbes and Hart asked him to go visit Shultz that evening. Hart called Shultz on the phone and made the arrangements for the visit. The three of them went to Shultz's home and discussed his claim against the respondent. Petitioner told Shultz that he ought to have a lawyer. He said, "Look at what they did to Lee Hart, but I don't have to be the lawyer. Of course, I would like to represent you but you don't have to hire me." There was no discussion on what basis he would handle the claim. He was not retained at that time. Sometime later he was again in Fort Wayne and again met Hart and Forbes. They went to Shultz's house. Shultz came out and petitioner and Forbes talked with him about his case again. Shultz came to Chicago on February 24, 1954. Forbes met Shultz at the station and they came to petitioner's office. The three of them discussed the case. Shultz signed a contract retaining petitioner to prosecute Shultz's claim against respondent for one-third of any amount collected from the claim. Shultz told petitioner he had talked to Jerry Gerhart, a former client of his, about his case. Gerhart told him that he had checked petitioner's reputation through Notre Dame University and a banker on La Salle Street and it was good.

Petitioner further testified that suit was filed, and a letter enclosing a copy of attorney's lien was sent to respondent notifying it that he had a contract with Shultz for his claim against respondent. He testified that he had no agreement to pay Forbes for obtaining the Shultz case, that he did not pay any of Forbes' expenses, and that Forbes did not investigate the case. Later Shultz came to Chicago and was examined by Dr. Zeitlin. Petitioner did not know whether Forbes went with Shultz to Zeitlin's office. He may have. Two pretrial conferences were held. The petitioner sub-

mitted a figure of $90,000 to respondent to settle Shultz's claim. On June 28 a letter was written to Shultz informing him that the case was set for trial on July 13. A check for $200 payable to Shultz was enclosed with the letter. Shortly thereafter he received a letter from Shultz discharging him as his attorney and enclosing a check for $900 payable to his order for expenses that he had advanced. The $900 was advanced to Shultz so that he would have money to support himself until the case was tried. No advancements were made previous to February 24. Petitioner did not know whether Forbes had advanced any money, but doubted it. Morris saw Shultz again in October of 1954 at Rochester, Indiana. Forbes was with him. Shultz answered some typewritten questions that he had prepared, which we discuss later.

The witnesses for the respondent were John W. Shultz and Leland L. Hart. John W. Shultz testified that on March 11, 1953, he was employed by the respondent. On this day, while at work, he was injured and as a result four fingers on his left hand were amputated. About two or three weeks after the accident, while he was in the hospital, Leland Hart, an employee of respondent, visited him. He had known Hart for several years. Hart said he would like to have him talk with Morris' representative, Jim Forbes. Hart said Morris represented him in trying to set aside a poor settlement which he had made, without a lawyer, with respondent for injuries he had incurred. Shultz told Hart that he was going to give the railroad a chance to settle and he would rather not talk to anybody until then. Some weeks later when he was at home Hart called again and brought Forbes to see him. On two different occasions Forbes and Hart discussed the case with him. On one of these visits Forbes advised him to get himself legal counsel and that he, Forbes, was there to represent a firm. On another occasion Forbes told him that if he decided on Tom

Morris whom he, Forbes, represented, Shultz could recover $125,000 clear.

Shultz further testified that in June of 1953 Hart called him and said that Morris was in town and that he, Forbes and Morris would like to see him. They came to his home. Morris told him that he had a serious case; that if he dealt with respondent they would do the same thing to him that they did to Hart. He told him if he had a lawyer this wouldn't happen. He was told his case was worth a lot of money. Forbes told him $125,000; Morris $95,000 to $96,000. Morris told him he should obtain a good lawyer but that he didn't have to hire him. He told Morris that if he hired a lawyer he would give Morris the first chance to settle the case. Shortly after this meeting Forbes and Hart again visited him and talked about the case. About 60 days later Morris, Forbes and Hart again came to his home. Morris again told him he should get a good lawyer to handle his action but that he did not have to hire him. Shultz said he was waiting to see if respondent would give him a reasonable settlement. Forbes and Hart called on him several times after that about the case. Forbes wrote him about the case on a number of occasions and asked him to come to Chicago and sign up. He finally told Forbes he would come to Chicago and see Morris because he was not satisfied with the figure that respondent had submitted for a settlement. Before doing it, however, he talked with a man by the name of Jerry Gerhart who was an employee of respondent and had been injured. Morris had represented him until another lawyer had taken over the case. Gerhart told him that Morris was a good lawyer.

Shultz further testified that on February 24 he went to Chicago and met Forbes. He went with him to Morris' office where he, Morris and Forbes discussed his case. He signed a contract employing Morris as his attorney. Morris called him about the middle of

June. He couldn't make out what he was trying to say. He asked Morris how he was getting along with the case and never got an answer. After this phone conversation he got disgusted with Morris. He was also upset because he was not being supplied with enough money on which to live. Thereafter he went to see respondent's claim agent about settling his case. He was informed that before he could settle it he had to discharge his lawyer. He went to see a Fort Wayne attorney who was also attorney for respondent. He told this lawyer's secretary what he wanted in a letter and she wrote it for him. The letter expressed his dissatisfaction with Morris' handling of the case and discharged him. He enclosed a check for $900 repaying the advancements made to him by petitioner. This was withdrawn from his own funds on deposit at the Anthony Wayne Bank in Fort Wayne. After sending the letter to Morris he settled his claim with respondent for $40,000. Respondent agreed to protect him from any claim Morris might make for attorney's fees. He next saw Morris in October of 1954 in Indiana. There he filled out a prepared list of questions which were submitted to him. One of the questions was:

"Was it solely as a result of your conversation with Gerhart and Lee Hart, together with your own impression of me, that made your mind up to seek my services?

"The Witness: I did."

Leland L. Hart, testifying for the respondent, said that he was now employed as a local freight conductor for respondent. He had known Shultz for twelve years. He first met Forbes through a Pete Eiker. His brother, Jake Eiker, was a brakeman on the Nickel Plate Railroad and was a former client of Morris. Pete Eiker brought Forbes to Hart's house and talked to him in regard to injuries he had received. He had settled with the railroad but did not figure he received just compensation. Forbes told him he thought he could

30

get his case reopened and produced a contract which he signed for the Morris firm to represent him. He called Forbes about the Shultz case. Forbes came down and they went to see Shultz. Hart corroborated Shultz's testimony as to the various conversations that took place between Forbes, Shultz and himself. He had had correspondence with Morris about his case, but did not meet him until introduced to him by Forbes at the Keenan Hotel in Fort Wayne in June 1953. Morris told him he wanted to meet Shultz. He called and made the appointment for Morris, Forbes and himself. He corroborated Shultz's testimony as to the subsequent meetings at Shultz's home. Some sixty days later he took Forbes and Morris to Shultz's home again. After this meeting with Shultz, Morris and Forbes came to his home. Morris and Forbes promised him that if Morris got the Shultz case he would be compensated for it. He said he later talked with Forbes about it and Forbes said he would get financial compensation if the Shultz case came into Morris' office. Later he received a letter from Forbes which stated that it was worth $5,000 if he got the Shultz case for Morris. He never asked Morris for the $5,000 but did borrow $25 from Morris to pay a debt.

The undisputed testimony discloses a clear pattern of persistent solicitation by Forbes to obtain Shultz's claim against respondent for petitioner. The record contains no explanation of why Forbes undertook all these strenuous activities in petitioner's behalf, other than the fact that they knew each other for many years. Petitioner argues that even if it were to be conceded that there was solicitation, it was not solicitation on his part, but by Forbes. Was Forbes petitioner's agent? Agency can be proved by the relation of the parties and the circumstances under which the action took place. Lake Shore Country Club v. Brand, 339 Ill. 504; Haugens v. Foster, 320 Ill. App. 212; People v. McCallum, 341 Ill. 578, 590.

31

Although petitioner denied that Forbes was his agent, we believe that the unrebutted testimony, in an unsatisfactory record, shows the contrary. Petitioner has failed to explain the circumstances of his relationship with Forbes. Why was Forbes, who lived in Lawrence, Michigan, constantly in Fort Wayne, Indiana, representing himself as petitioner's representative? Why did he induce Leland Hart to sign a contract employing petitioner to handle his claim against respondent? There is more that remains unanswered. On two occasions Forbes was with petitioner in Fort Wayne and discussed with Shultz his claim against respondent. On one of these occasions Forbes told Shultz his case was worth $125,000. Forbes was with petitioner when Hart was promised financial remuneration if petitioner got the Shultz case. On several other occasions he was in Fort Wayne importuning Shultz to hire petitioner. Forbes met Shultz in Chicago and was with him in petitioner's office when Shultz signed the contract with petitioner to represent him. Again, after the disposition of Shultz's claim, Forbes was with petitioner in Indiana when certain questions were put to Shultz relative to the present action for fees.

■ In the case of Puls v. Chicago & N. W. Ry. Co., supra, the action involved a petition for attorney's fees. In considering the issue of solicitation of the case by an agent of petitioner, the court said:

"The evidence of her activities in behalf of this partnership, and her solicitation of the Puls' claim is such as to furnish another reason why the petitioner should not be given the benefit of an attorney's lien, quite apart from the question of whether he was discharged as the respondent claims, or when he was discharged, if at all. The manner in which this claim was solicited, is, in our opinion, inconsistent with and contrary to the ethics of the profession and the public policy of the State, and in such case attorney's fees

32

may not be recovered. Ingersoll et al v. Coal Creek Coal Co., 117 Tenn. 263; The People v. Berezniak, 292 Ill. 305."

A comparable pattern of solicitation was indicated in this case. We also find a similar pattern of solicitation in In re McCallum, 391 Ill. 400. We cannot close our eyes to the realities of common experience in dealing with the issue before us. We are of the opinion that the evidence of the relation of Forbes and petitioner and the circumstances through which petitioner obtained the Shultz case is sufficient to prove Forbes was petitioner's agent.

■ Petitioner did not testify in rebuttal. He appears not to have been aware of the serious character of the testimony of respondent's witnesses. If he was, we believe he would have testified. Further, there is no showing why Forbes, petitioner's friend for over thirty years, who traveled on many occasions from Lawrence, Michigan, to Fort Wayne and Chicago in behalf of petitioner's interests, was not present to deny his soliciting activities on behalf of petitioner if he could. Under such circumstances, we think it proper to apply the rule that there is a presumption against the party failing to produce the contradictory testimony. Pipal v. Grand Trunk Western Ry. Co., 341 Ill. 320; Flannery v. Flannery, 320 Ill. App. 421; Mantonya v. Reilly, 184 Ill. 183.

Petitioner cites Kusak v. Karnik, 323 Ill. App. 277, 55 N.E.2d 98, Ryan v. Pennsylvania R. Co., 268 Ill. App. 364, and Sutton v. Chicago Rys. Co., 258 Ill. 551, in support of his contention that respondent failed to prove that he either personally or by an agent in his employ obtained the contract of employment from Shultz through solicitation. We have read these cases. They are clearly not in point in that the question of agency was either rebutted or not proven. Here we have unrebutted testimony that strongly indicates an agency relationship.

33

■ Petitioner argues that the trial court had the opportunity to observe the witnesses and their demeanor while testifying and thus could best determine their credibility, interest and motives. We are here confronted with the fact, however, that the testimony of unimpeached witnesses pertaining to the solicitation of the case by Forbes, stood uncontradicted by the testimony of petitioner or by circumstances that would indicate that such testimony was inherently false or improbable. It is our opinion that under the circumstances it was error for the trial court to reject this testimony of the witnesses of respondent. Porter v. Industrial Commission, 352 Ill. 392, 398; Kelly v. Jones, 290 Ill. 375, 378–9; Mammina v. Homeland Ins. Co., 371 Ill. 555, 560; Tenerelli v. Eddy Stoker Corp., 9 Ill.App.2d 390.

The issue of solicitation involved in the instant case is one of the gravest problems that confronts the bench and bar of this community. Its evils have been intensified by the tremendous increase in personal injury litigation and the fact that those who benefit by it have by the use of large expenditures organized the business on a vast scale. This is illustrated by the description of a single lawyer's activities in the case of Atchison, T. & S. F. Ry. Co. v. Andrews, supra, at page 559. The court quoted from the report of the master in chancery:

"The magnitude and character of the business [Andrews' business] is demonstrated by these facts. There are ninety-two claims involved with aggregate damages claimed approximating $5,000,000. This does not embrace all the business done in the course of a few months. In that short time Sol Andrews had made an investment of approximately $200,000 in advances for the scheme, of which Joseph D. Shane advanced approximately $50,000. Railroad employees who were

34

in key position to influence the selection of lawyers were enticed into becoming 'chasers' of law business on a full or part time basis. Each claimant was urged to become a solicitor for additional claims and arrangements were made to pay him a percentage of the fees."

It is true that only a small minority of the profession are thus engaged, but nevertheless their activities bring the entire profession into disrepute. The Canons of Ethics adopted by every bar association in the country have condemned the practice. The practice finds no support in any decision in any jurisdiction; still less, that of this state, where the Supreme Court ordered the disbarment of the respondent in In re McCallum, 391 Ill. 400, and a suspension of five years in In re Veach, 1 Ill.2d 264.

Our conclusion in the instant case cannot be based merely upon the citation of legal authorities. We are of the opinion we would be remiss in our duty if we did not point out the sordid realities of solicitation as it is known to exist. This may best be done by quoting rather liberally from an article in the Northwestern University Law Review, issue of January-February 1953, Volume 47, Number 6, page 895, where there is a complete and thoroughly documented discussion covering what is termed "the chaser problem." It is there said at pp. 898-9:

"Up to this point the term 'chaser' involves two groups: the original informant, and the man who originally contacts the injured person. Actually, the chasing racket involves at least three, and sometimes four groups. The 'contact' man is seldom a lawyer himself. He either works for a lawyer or free-lances, selling the contract to the highest bidder. Thus, the contract passes to a third group, a relatively small number of the personal injury lawyers in Chicago, who

35

traffic in the chaser-type contract. Before he even knows of the case, there have been two bites taken out of his fee—one to the informant, and one to the 'contact' man. Partly because of the cost of procurement, the old 'one-fourth if settled, one-third if it goes to trial' rule has become a flat one-third to one-half of whatever is realized, encouraging the lawyer to settle rather than go to court. Another factor stimulating settlement in these cases is that the chaser attorney is seldom a trial lawyer, so that to go to court would mean the necessity of hiring a successful trial attorney on a flat fee or percentage basis.

"While the various groups involved under the term 'ambulance chaser' may be regarded as black sheep by their brethren, they play a significant role in settlement practices and personal injury litigation in the Chicago area. Almost all serious personal injury cases are chased, and estimates of the number in which a chaser contacts the injured party run as high as 95%. Over half the claims presented for personal injury of any degree of seriousness are probably handled by these lawyers."

It is stated that from 80 to 95 percent of all serious personal injury cases are chased (page 899, Note 24a); that the ambulance chaser has taken over a large part of the personal injury practice (page 903), and that (page 904):

"First, the chaser is basically dishonest when soliciting a client. He is interested primarily in getting a contract signed, thus virtually assuring himself of a one-third cut of any settlement figure or jury verdict. To get the contract the chaser often vastly exaggerates the worth of a claim, playing subtly on emotions of greed and avarice, assuring the injured person that his services will net a handsome figure. Actually, the chaser is well aware of the true value of a case, and in settlement negotiations will often agree to a figure little higher

36

than the injured might have obtained by direct negotiation.

"Second, this dishonesty extends to cases which are properly the subject of litigation rather than settlement. The ambulance chaser is rarely a trial attorney. He aims at settlement, and if a case is to be litigated, he must usually retain another attorney for this purpose. This, however, involves splitting the one-third contingent fee into several pieces. Rather than do this the chaser may settle a claim for an amount considerably less than it is actually worth.

"Third, an especially vicious practice has been developed by the chasers with the evident approval of insurance companies. This involves the so-called 'package-deal' whereby the two parties settle as many as 40 or 50 cases at one time. Cases where the liability of the insurer is non-existent or doubtful will be given some recovery, and cases where liability is clear and the injury more serious will be scaled down to a comparatively low figure. Thus, everyone gets something, but at the expense of the more deserving victims."

There is another aspect of the evils of this practice that is not commented upon in the article but of which all judges who have sat in pretrial in the courts of Cook county are aware. The unethical lawyer who is the recipient of cases procured by "chasers," if he is to maintain his source of supply, must of necessity take the bad cases along with the good. A very substantial portion of these cases have no real merit and an ethical lawyer would not file suit on them. The unethical lawyer must file suit. These cases either become a part of the package settlement that is discussed in the article, are settled at the pretrial conference for their nuisance value, or must be tried before a jury by the court. As to the out of state cases, the "chaser" induces the party who is injured to retain a lawyer in Cook county using as a lure the larger settlement or

verdict that can be obtained if suit is filed here. See Atchison, T. & S. F. Ry. Co. v. Andrews, supra, at page 566. It has been estimated that the overall cost of operating a courtroom with a jury in Cook county is approximately $800 per day. The average time required to try a law jury case is two and one-half days. However, in actions involving substantial damages and severe injuries, trials of from one to two weeks are not uncommon. Thus not only does such out of state litigation add to the case load of our courts but the taxpayers of this state must assume the burden of paying the expenses of litigation for nonresidents. It is, therefore, clearly apparent that solicitation not only brings the legal profession into disrepute, but it also increases the burden of expense in operating our courts and is one of the principal factors creating the overwhelming backlog of negligence cases, which results in litigants waiting about four and one-half years for a trial in the Circuit and Superior Courts of Cook county.

The existence of these evils is not new. They have repeatedly been commented upon in other jurisdictions. (See State Bar Journal of California, Volume 6, No. 4, page 79. See In re Bar Ass'n of City of New York, 222 App. Div. 580, 227 N. Y. Supp. 1.)

If we were to affirm the judgment of the trial court on the basis of the record before us, we would in effect be placing our stamp of approval on all of the venal aspects of solicitation. We in effect would be encouraging vicious activities comparable to those of the defendants in the case of Atchison, T. & S. F. Ry. Co. v. Andrews, supra. We would be abandoning the ethical and professional standards that the bench and bar have been striving to build over the centuries. This we cannot do.

We find, therefore, that the order of the trial court allowing attorney's fees is against the manifest weight

of the evidence. The judgment of the trial court is reversed and the cause remanded for a new trial.

Judgment reversed and cause remanded for new trial.

McCORMICK, P. J. and SCHWARTZ, J., concur.