(No. 24702.— )
IN RE LOUIS DUNN, Attorney, Respondent.

*Opinion filed December 15, 1938—Rehearing denied Feb. 8, 1939.*

WILSON, J., dissenting.

CHARLES LEVITON, *amicus curiae.*

HENRY P. CHANDLER, President, and ALBERT E. JENNER, Secretary, for the Chicago Bar Association.

POPPENHUSEN, JOHNSTON, THOMPSON & RAYMOND, and STUART B. KROHN, (FLOYD E. THOMPSON, of counsel,) for respondent.

Mr. Justice Jones delivered the opinion of the court:

A complaint made by Emilia Chorvat and Mary Chorvat charging respondent, Louis Dunn, with unethical and unprofessional conduct was filed with the committee on grievances of the Chicago Bar Association. After a hearing, the committee recommended the disbarment of respondent. The report was approved by the board of managers, and a rule was asked to show cause why he should not be disbarred.

The complaint involves the circumstances under which respondent procured a contract of employment. The Chorvat girls were very seriously injured in an automobile accident about 11:00 o'clock P. M., January 14, 1936, and were taken to the Garfield Park Community Hospital, in Chicago. They were unconscious and did not regain consciousness until a few days later. Their parents and their family physician, Dr. William J. Rurik, were notified immediately and emergency treatment was given. About 9:00 o'clock the next morning, C. J. Hassenauer, the hospital superintendent, and William G. Beyer, the hospital office manager, discussed with the parents of the girls the matter of hospital bills, which they pointed out would be large in view of the seriousness of the injuries. After learning that the Chorvats would be unable to pay, respondent was called and was asked to investigate the case and find out whether the other party was liable and whether he was insured. Respondent investigated and came to the hospital shortly after noon and reported the other party was insured and that there was a fair chance of recovery. He was told the parents of the Chorvat girls wanted to talk with him and he went to the third floor where he met and talked with them. He left and returned at about 5:30 o'clock that afternoon. About 6:00 o'clock the parents signed a contract employing respondent on a one-third contingent basis. Emilia signed a similar contract on January 20 and Mary did so on January 29. The facts concerning the procurement of these contracts are highly controverted.

The testimony of Mr. and Mrs. Chorvat and their son, John, was to the effect that Beyer, Hassenauer and respondent told them they would have to employ respondent in order to protect the hospital, or move the girls; that the parents protested that the girls were in no condition to be moved and they did not want anything to do with a lawyer at that time because of the serious condition of the girls; that respondent left and when he returned that afternoon he told them they would have to sign the contract or have the girls moved; that he took his watch out of his pocket, held it in his hand, and told them they would have to sign the contract by 6:00 o'clock. The credibility of this part of the testimony is weakened somewhat by proof that respondent wore a wrist-watch and had not carried or owned a pocket-watch for several years. Dr. Rurik testified that respondent told him sometime after the contract with Mr. and Mrs. Chorvat was signed that he wanted the girls signed up to cover the hospital bill and to prevent other lawyers coming in on the case.

The testimony on behalf of respondent denies that any pressure was employed or that the Chorvats were told they must employ respondent or any other particular lawyer. Beyer and Hassenauer testified they told the Chorvats the hospital would have to be protected by the filing of suit, since they were unable to pay, but that they made it clear the Chorvats could employ any reputable attorney; the Chorvats told them they wanted to talk to a friend of theirs before making up their minds, and Hassenauer told them that would be satisfactory. Beyer and Hassenauer explained that the only time the hospital was interested in their patients' lawsuits was when the injuries were serious and the patient was unable to arrange for the payment of the bill; they never insisted on the employment of any particular attorney. They stated that the hospital had used respondent almost exclusively for the last two and one-half years but that others had been used; that respondent

had been employed by patients in twelve or thirteen such cases after making investigations; that he never made investigations except when requested by the hospital to do so, and that he never split his fees with the hospital. The hospital did not pay him for making the investigations.

Respondent testified he received a call from the hospital about 9:00 or 9:30 A. M., January 15, and, according to instructions, immediately made an investigation. He found that the other party was insured and that there were several witnesses to the accident. He then went to the hospital, arriving about 12:30 or 1:00 o'clock in the afternoon. He was introduced to the parents and to their son, John. He told them the results of his investigation and advised them that they should employ a lawyer soon, in order to get statements from the witnesses before the insurance company did. They said they first wanted to talk to a friend who was a politician. Respondent told them if they decided to employ him to either call him or inform the office, and then left; that John called him at the office about 5:00 o'clock and informed him they had decided to hire him rather than a strange lawyer. John denies that he called respondent but the office memorandum of respondent's secretary shows that he did call. Respondent then went to the hospital and the contract was signed by the Chorvat parents about 6:00 o'clock. Respondent denies that he exercised any coercion or made any threats. In this he is corroborated by the nurse and switchboard operator who witnessed the contract.

The testimony as to the circumstances surrounding the signing of similar contracts by Emilia and Mary Chorvat is likewise conflicting. Respondent talked to Emilia January 19, and she told him she did not feel like talking about the contract. He came back the next day and she signed the contract. She testified respondent told her she had to sign that day or be moved to the County Hospital. Her mother, who was present, testified merely that respondent

told her she should sign. Respondent testified that Emilia asked a lot of questions about the terms of the contract, the chances of recovery, etc., but that he used no pressure or threats and she made no protest. He is corroborated by Ada Caverly, the nurse present at the time.

Mary Chorvat was more seriously injured and was unconscious for a longer period of time than Emilia, and did not sign the contract until January 29. Emilia testified she told Mary respondent was the lawyer she and her parents had signed up with and for her to sign. Mary testified she recalled seeing respondent in her room but did not remember the date nor that she signed a contract. Mildred McClellan, the nurse in charge, testified Mary was not in very good condition physically but that mentally she seemed to be all right. Respondent testified she asked several questions and seemed to be rational. It is established that Mary was conscious at the time and that respondent had the nurse's permission to see her. The medical testimony is conflicting as to how clear her mind was, owing to the difference of opinion as to the effect of the quantities of codeine she had been taking. There is no evidence that any duress or pressure was exercised upon Mary.

After the contracts were signed, respondent continued his investigations and was assisted by John Chorvat in locating witnesses and talking to them. He negotiated with the insurance company, and, failing to reach an agreement, filed suit. He visited the Chorvats frequently and reported the progress he was making, and his relations with them were entirely friendly and harmonious. He brought the representative of the insurance company to their home once, and they made no complaint that respondent was not their lawyer. They authorized him to notify attorney Gustav A. Riedl, who had filed a claim for an attorney's lien, that respondent was the only lawyer representing them. At Emilia's request, respondent advanced $51.50 with which to purchase a brace for Mary, and Mary gave him a note

for that amount. He also advanced $53 for court costs. No complaint is made as to the way respondent was handling the case, nor was any complaint made to any one about the manner in which the contract was procured until late in August, 1936, when Emilia talked to her employer, Goldblatt Brothers, about her case. They referred her to their attorney, Philip A. Weinstein, who, without any previous conference or consultation with the respondent, called him by telephone and demanded that he withdraw from the case. When he refused to do it, Weinstein dictated a letter for the Chorvat girls, summarily discharging respondent from employment. No tender or offer was made to reimburse the respondent for money actually expended by him or services performed. No mention was made of the hospital bills or nurses' bills. What inducement there was for this action does not appear of record. The letter demanded the dismissal of the suits instituted by respondent and threatened him with legal action, if necessary.

Canon of Professional Ethics. No. 7, in part provides, that "Efforts, direct or indirect, in any way to encroach upon the business of another lawyer are unworthy of those who should be brethren at the Bar; but, nevertheless, it is the right of any lawyer, without fear or favor, to give proper advice to those seeking relief against unfavorable or neglectful counsel, generally after communication with the lawyer against whom the complaint is made."

The record discloses, without contradiction, that when the respondent asked Emilia why he had been discharged she said Weinstein was her lawyer and "go talk to him." Respondent replied, "That is all the gratitude you show me for nine months' services I have rendered?" Respondent further said, "Tell me what I have done that has made you change?" She said, "Nothing at all. It is just the hospital that we don't like." The whole record makes it apparent that all the dissatisfaction arose after the Chorvats were apprised of the amount of the hospital bill. The agreements

they signed authorized the respondent to deduct the amount from the sums paid in settlement of the claims for personal injuries.

Weinstein represented complainants before the grievance committee, and is also representing them in new suits against the insurance company.

In disbarment proceedings the charges against the accused must be proved by clear and convincing evidence, and the record must disclose a case that is free from doubt. The disbarment of an attorney is the destruction of his professional life, and it can be warranted only by clear and satisfactory proof. (*In re Lasecki,* 358 Ill. 69; *People* v. *Hammond,* 356 id. 581.) We have made a careful study of all the evidence and have come to the conclusion that the charges as to respondent's conduct in procuring the contracts have not been sustained by such proof. After fully considering the testimony of all the witnesses we do not believe the respondent was guilty of such conduct.

There is no evidence in the record tending to show that respondent was a solicitor of business. Whatever came to him of this character was tendered him by the hospital. The record does not indicate that he overreached any one or even tried to do so. Whether the hospital was justified in its endeavors to protect itself against insolvent or indigent patients is not a question of professional ethics. We do not commend the arrangement between the hospital and the respondent, but nevertheless it is entirely insufficient to warrant his disbarment or suspension. He was more sinned against than sinning. It is, therefore, our judgment that the rule against him be discharged.

*Rule discharged.*

Mr. JUSTICE WILSON, dissenting.