(No. 29065.—

IN RE V. RUSSELL DONAGHY, Attorney, Respondent.

*Opinion filed November 18, 1948—Rehearing denied Jan. 17, 1949.*

CHARLES LEVITON, of Chicago, (JAMES P. CAREY, JR., of Chicago, AMOS H. ROBILLARD, of Kankakee, and ALBERT E. JENNER, JR., of Chicago, of counsel,) *amicus curiae.*

VOGEL & BUNGE, and DAVID A. SCHALLMAN, both of Chicago, for respondent.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

The Board of Governors and the Committee on Grievances of the Chicago Bar Association, pursuant to Rule 59, filed complaints against respondent, an attorney, charging unprofessional conduct in that he solicited personal injury cases, and recommended suspension for a period of three years,

These same cases were consolidated and were before this court in *In re Donaghy,* 393 Ill. 621. This court there held that respondent had been denied his right to present testimony and that the committee erred in refusing the respondent the opportunity to present the depositions of certain witnesses, and ordered the cause re-referred. Upon conclusion of the hearings on re-reference the committee concurred in the original recommendation. The respondent filed exceptions to the reports.

Many witnesses were interviewed and much testimony taken. The record and abstracts are voluminous and both cases come before us now for a complete review and determination upon the merits. The complaints are several, but narrow down to two, both of the "runner" or "ambulance chaser" type of offense.

The first charges, known as Commissioners case No. 893, were made September 11, 1941, and charged that respondent was guilty of conduct and practices tending to defeat the administration of justice and to bring the courts and legal profession into disrepute by the solicitation and procurement of personal injury claims by the employment of a solicitor, one Albert L. McAfee.

These charges were followed on April 23, 1942, by complaint in Commissioners case No. 959, consisting of three counts alleging solicitation and procurement of legal representation of various personal injury claims. The first and third counts, the commissioners found, were not sustained by the proof and were dismissed.

Count two, known as the Eveland case, involves the claim of one Effie Eveland, a patient at the Swedish Covenant Hospital. In this count respondent is specifically charged with responsibility for the actions of certain hospital authorities, or their employees, in refusing permission to permit the patient to see the injured person's employer, Urow, and one Zeman, an attorney and relative of Urow, brought to the hospital by said Urow, and in threatening

removal of the injured employee from the hospital unless she employ the respondent to represent her in her claim for damages.

Membership in the legal profession and engaging in the practice of law is a privilege and not an absolute right, (*People ex rel. Chicago Bar Assn.* v. *Baker,* 311 Ill. 66,) and no attorney will be permitted to engage in the conduct of his profession in such a manner as to bring the same into disrepute.

The legal calling is a time-honored profession and the courts owe a duty to protect the public from impositions and improper practices. This duty has repeatedly been declared by this court. (*People ex rel. Chicago Bar Ass'n* v. *Lotterman,* 353 Ill. 399; *People ex rel. Chicago Bar Ass'n* v. *Green,* 353 Ill. 638; *People ex rel. Chicago Bar Ass'n* v. *Hansen,* 316 Ill. 502.) Such duty, and the manner in which it is exercised, must not be despotic, but the charges must be sustained by clear and convincing proof and the misconduct must be shown to have been fraudulent and the result of improper motives, and the proof must show intent. (*In re Smith,* 365 Ill. 11.) The courts must not exercise their supervisory control in an arbitrary manner, but must show a legal discretion in the exercise thereof. *In re Lasecki,* 358 Ill. 69.

The disbarment of an attorney is the destruction of his professional life, his character, and his livelihood. (*People ex rel. Chicago Bar Ass'n* v. *Mall,* 354 Ill. 323; *In re Lasecki,* 358 Ill. 69; *In re Dunn,* 370 Ill. 413.) The court should, therefore, disbar in moderation. (*People ex rel. Chicago Bar Ass'n* v. *A'Brunswick,* 315 Ill. 442.) Likewise, the same considerations obtain in the application of a three-year suspension rule. A removal of an attorney from practice for a period of years entails the complete loss of a clientele with its consequent uphill road of patient waiting to again re-establish himself in the eyes of the public, in the good graces of the courts and his fellow

lawyers. In the meantime, his income and livelihood have ceased to exist. The courts, however, should not hesitate to inflict the penalty where the punishment is fully deserved. *In re Goodman,* 377 Ill. 178.

Respondent first contends and re-argues that Rule 59 constitutes an illegal delegation of judicial power by this court. We do not consider this contention, as the question has been passed upon several times by this court since the adoption of the rule. (*In re McCallum,* 391 Ill. 400; *In re Roth,* 398 Ill. 131.) In fact, the very issue was decided in this same case. (*In re Donaghy,* 393 Ill. 621.) The judicial power and function in this case is being exercised here and now for the first time.

Effie Eveland had been employed for a short time, as a maid, in the home of the Urows. While on an errand for her employer, she was struck by a truck and rendered unconscious on June 22, 1940, and was taken to the Swedish Covenant Hospital. The Urows called at the hospital accompanied by Adrian Zeman, a cousin-in-law and a young lawyer. Complainants charge that after several visits Urow and Zeman were denied admittance to the hospital to see Miss Eveland by persons employed there. One Dahlquist, for many years the financial secretary and business manager of the hospital, with Miss Eveland's knowledge at least, wrote a letter to the patient's father in Wisconsin, advising the father the hospital attorney had been "signed." This letter was signed by "Effie." A wire from the father, in response to an inquiry from the hospital, directed the hospital to have the hospital doctor and attorney take charge. Dahlquist called the respondent, who sent an investigator to the hospital. A contract was then signed two days after the accident. Respondent undertook the representation, obtained an adjustment for Miss Eveland, which apparently met with her satisfaction and she so testified. She also testified she understood that unless she retained the

hospital doctor and lawyer she would have to be moved to another hospital; she believed it was Dahlquist who made such a representation. Neither Donaghy nor anyone from his office were present at that time. The commissioner ruled on this testimony as follows: "It is in for what it is worth. It is not very positive evidence of course." The testimony further shows Miss Eveland received $1150 in full settlement of her claim through the efforts of respondent and had authorized a settlement of $1000 if necessary, and that she was as "satisfied as I could be" with the settlement as made and had no complaints about respondent's conduct of the case; that she saw Donaghy at the hospital only once. The father testified he received a wire and replied, instructing the hospital to have the hospital doctor and lawyer take charge.

Dahlquist testified he told respondent "Miss Eveland wanted us to get her a representative or attorney." Respondent suggested Dahlquist communicate with her parents because respondent mistakenly understood she was under age. Also, Dahlquist wrote the letter to the father at the patient's request. Urow testified he felt he had an obligation to the girl to pay her expenses and that is why he wanted Zeman to represent her. This would indicate a desire to protect his own interest rather than a real concern for the welfare of the maid. Dahlquist's testimony also indicates Miss Eveland's friend, a Miss Neilson, who was present at the hospital on several occasions, influenced to some degree the choice of attorneys in favor of respondent and against Zeman.

Following the settlement of the Eveland matter, Zeman claimed he was entitled to some compensation and he made an application for adjustment of attorney's lien. Settlement was made to him by the owner of the automobile involved for $150. Zeman performed no services for the client. He had no written contract and was taken to the

hospital by the relative, Urow. Miss Eveland had never met Zeman before his arrival at the hospital shortly after the accident. The record shows Zeman and Mrs. Urow asked Miss Eveland to retain Zeman.

Respondent's relationship with the hospital dates back over a period of some fifteen years. The original contact was made through one Wentzel, who was a paid investigator of respondent. Some criticism might be made of the initial representation, but we deem it too long ago, outside the scope of this complaint, and a full disclosure concerning this does not appear. However, respondent was approved by the board of the hospital along with three or four other attorneys, all of whom, except respondent, were officially connected with the hospital or were members of the Covenant. The hospital authorities continued to recommend respondent along with the others because they felt he was satisfactory, he asked for no reduction in the hospital bills and remitted same to the hospital. Sometimes respondent was recommended at the request of various doctors.

On the surface, the inferences to be drawn from all the testimony in connection with this case, give rise to many suspicious circumstances of unfavorable tenor. Dahlquist testified there was difficulty collecting a certain check given to the hospital for a substantial amount which he had endorsed and respondent had effected collection relieving him of any liability and since then respondent had been favorably considered by the hospital authorities,— other accounts had been difficult to collect and as a protection to the hospital a list of approved attorneys had been prepared. Respondent was placed on this list and from time to time he was recommended to patients. Occasionally, Dahlquist had been given small gifts by respondent and on one occasion $25 was given him as a Christmas gift which respondent contended was a reimbursement of expenses. Respondent often gave Dahlquist and the super-

intendent turkeys, ducks and chickens on Christmas and Thanksgiving.

We think the relation shown by the evidence between the hospital and Donaghy borders on the line between propriety and impropriety. Yet there is no evidence in the record to establish there was any "arrangement" to which respondent could be said to have been a party. No showing is made that Donaghy had any knowledge of Dahlquist's activity in his behalf until respondent was called into the case. Certainly no showing was made whereby Dahlquist or any other hospital employee was to have received, or expected to receive, or had been promised any percentage or share of the recovery, unless the small gifts made to Dahlquist could be construed as such. This practice of making gifts sometimes indulged in by a few members of the profession as a means of showing gratitude becomes, at times, but a sly, indirect method of doing what cannot be done directly. It is a bad practice and may lead to serious consequences. We do not condone it. Nothing appears here, however, of a substantial nature which would establish by clear and convincing proof that Dahlquist was actuated by any motive other than the best interests of the hospital. All lawyers run the risk of the natural consequences which sometimes flow from the ardent and enthusiastic actions of well-intentioned friends. Attorneys must scrupulously guard against ethical infractions to avoid the disrepute into which they may fall and carry down with them the standing, regard and esteem of the legal profession.

Suspension of an attorney is not warranted on proof that officers of a hospital recommended him to patients. (*In re Dunn,* 370 Ill. 413.) In that case, at page 419, we said "In disbarment proceedings the charges against the accused must be proved by clear and convincing evidence, and the record must disclose a case that is free from doubt. The disbarment of an attorney is the destruction of his professional life, and it can be warranted only by clear

and satisfactory proof. [Citing cases.] We have made a careful study of all the evidence and have come to the conclusion that the charges as to respondent's conduct in procuring the contracts have not been sustained by such proof. After fully considering the testimony of all the witnesses we do not believe the respondent was guilty of such conduct. There is no evidence in the record tending to show that respondent was a solicitor of business. Whatever came to him of this character was tendered him by the hospital. The record does not indicate that he overreached anyone or even tried to do so. Whether the hospital was justified in its endeavors to protect itself against insolvent or indigent patients is not a question of professional ethics. We do not commend the arrangement between the hospital and the respondent, but nevertheless it is entirely insufficient to warrant his disbarment or suspension. He was more sinned against than sinning. It is, therefore, our judgment that the rule against him be discharged."

A review of this type of case was set forth by this court in the recent case of *In re Mitgang*, 385 Ill. 311. We do not deem it advisable or necessary to engage in further discourse upon the matter, except to say we do not believe there is enough *scienter* on the part of respondent to warrant the infliction of the punishment recommended on the strength of this charge alone.

Case number 893 is referred to as the McAfee case. Respondent urges that he stands convicted alone, if he stands so convicted, upon the testimony of a former college friend, turned renegade,—who is unworthy of belief and whose reputation for truth and veracity is bad,—a former childhood playmate and friend and college roommate and law student, whom he had advised and encouraged. Respondent says there is not a scintilla of evidence in the entire record except the statements of McAfee, upon which

to sustain the charges. Personal injury lawyers, representing plaintiffs for the most part, must compete against the investigatory staffs of the large corporations and insurance companies and must necessarily hire investigators for their own success. Any investigator may *claim* an arrangement for fees. The courts owe a duty to demand adequate proof of claims and demands by informers and investigators.

Respondent has practiced at the bar of Illinois since 1924 with a wide and varied experience in the trial of personal injury cases, mainly as a "plaintiff's lawyer." He has been successful in this connection.

The case, after most of the proofs were in, was reopened to permit respondent to introduce proof of respondent's good character and standing and reputation at the bar. By stipulation of the parties, it is conceded that members of the judiciary and of the bar would attest to his general reputation for truth and veracity and for honesty, integrity and ethical conduct. The list submitted makes an imposing array. Such testimony, though not controlling in the face of proof of specific improper acts, (*In re Amaden,* 380 Ill. 545, 558; *In re Harris,* 383 Ill. 336; *In re McCallum,* 391 Ill. 400,) is highly proper and carries due weight where the proof of the foundation of the charge largely depends upon the uncorroborated testimony of a hired investigator, as in this case. Here, no client comes forward to accuse the respondent of improper conduct. No charge is made that respondent was not fair in his dealings with the persons whom he represented; no dissatisfaction exists among those who sought his services for hire. There is no ground for asserting respondent at any time *overreached* his people.

Complainants contend however, that respondent's own actions and correspondence are proof sufficient under the decisions. To say the least, respondent did not use care in his written expressions to his associate. Counsel stresses

a certain letter, complainant's exhibit 6, dated September 16, 1937, from respondent to McAfee as the foundation for this charge.

But before analyzing this exhibit it is imperative that we review the relationship between these parties. Respondent maintains that the facts show McAfee launched upon the study of law, but was expelled. For a number of years, the friendship was at a standstill. In the summer of 1937 McAfee made a call upon respondent at the latter's office in Chicago. McAfee was entertained in respondent's home, the acquaintance was renewed and respondent undertook to advise McAfee upon his future course and to help him get started in some business. He encouraged McAfee to resume his law studies. McAfee inquired about claim adjusting and, as many lawyers are sometimes wont to do, respondent threw open his forms files to McAfee with a view toward assisting him in Toledo. In due time McAfee began to command some small claims business. Respondent advised him concerning certain legal matters, particularly those involving intricate questions of interstate and intrastate commerce. Respondent was recommended by McAfee in a number of cases, and some representations were had thereby. In these and other cases McAfee was hired by respondent to investigate, take photos, etc., and was paid for his services and expenses.

While in Columbus, Ohio, in the fall of 1937, on a matter referred to him by a Chicago attorney, respondent called on McAfee at his hotel, in company with one Mike Dumm, an independent investigator in Toledo. Some talk was had about a partnership between McAfee and Dumm. At that time, respondent, in reply to a question by Dumm, advised no payments as commissions on cases referred to respondent were or would be paid.

These facts as claimed by respondent are to a large extent corroborated by other witnesses, many of them by admissions of McAfee himself.

We shall not review, in detail, each case in which respondent and McAfee were involved. The Patrick case, involving a leg amputation, was settled without counsel. Respondent spent considerable time on this case and received neither fees nor expenses. McAfee received $100 or more as an independent investigator.

In the Price case, involving a death claim, Dumm and McAfee were employed to investigate and were paid for their services. Respondent made a contract with the administrator, Price, and advanced $25 to Price as a loan. Later Price sought an additional loan which was refused. A release of attorney's lien was demanded and signed, the loan repaid and thereafter Price settled the death claim. Respondent and his co-counsel received no payments for services rendered in connection with this matter.

In February, 1938, the Scott Rader case was referred to respondent by Dr. Stewart, an orthopedic surgeon whom respondent knew personally and who had taken care of respondent's mother. Respondent and the doctor so testified. Rader had a claim against the B. and O. Railroad Company and had an attorney in Toledo, with whom he was dissatisfied. Respondent hired McAfee and Dumm as investigators for which they were paid. In this matter a judgment for $15,000 was recovered and a full and complete accounting made to Rader. Respondent and another Chicago attorney, as co-counsel, received one third as their fees and costs and expenses including injunction litigation at Lima, Ohio. Sometime later, in the summer of 1941, respondent was summoned to Toledo to meet McAfee, under the threat that if he did not come he was going to be "put out of business." Respondent contends McAfee told him that if respondent did not give him $7500, respondent would be charged with soliciting cases and that respondent "could not stand" such a charge. Respondent's reply was that he owed him nothing and would pay nothing. Following this conversation McAfee made his complaint to the Chicago

Bar Association. This demand for money made upon respondent is supported by the testimony of Mike Dumm, although the latter's testimony is somewhat unreliable. There is no denial of this demand in the record. In fact, Dumm called respondent and informed him of the machinations of McAfee in this regard.

On re-reference, many depositions were taken concerning McAfee's reputation for truth and veracity, and cross-examination of the witnesses covered a wide latitude. There is much testimony both ways on the question of McAfee's reputation. Some is good, much is bad. The record contains considerable proof of particular acts purporting to reflect upon the witness McAfee, most of which is improper under the rules adopted in this State. *People* v. *Halkens,* 386 Ill. 167; *People* v. *Anderson,* 337 Ill. 310.

McAfee testified respondent agreed that McAfee should solicit cases and receive one third of all his fees collected on cases referred; that respondent coached him in the art of solicitation, gave him forms, advised on procedure and to follow newspaper reports of accidents and the like; and that respondent would advance expenses. There is no corroboration of these facts anywhere in the record. McAfee, therefore, becomes the nub of the case against respondent. Yet the proof indicates on the part of several witnesses, at least, that McAfee has and had a bad reputation for truth and veracity. He made the complaints. Dumm corroborates respondent on the charge that an attempt was made to exact tribute from respondent either in the form of a percentage of the fees in the Rader case or an outright demand for a large sum through extortion. There is evidence in the record, too, that McAfee's first demands were of a lesser amount,—that all he wanted was his claimed percentage fee,—and the matter would be dropped. The fact remains respondent did not pay any other than the investigation fee. This would indicate no such agreement was ever made by respondent. McAfee

knew or should have known he was not entitled, as a layman, to any such division of fees and that any agreement to this effect would not be binding and was unenforceable as such, as against public policy.

McAfee and Dumm, by their own admissions, were soliciting cases for a number of Ohio attorneys, two of whom were disbarred, all without the knowledge of respondent. The difficulty here seems to be due to the fact respondent would not "split" his fees.

McAfee refused to personally appear before the committee after his original complaint was made by letter. The testimony shows McAfee demanded money from respondent to paint his wife's flat, to pay a note, and to purchase tires, all of which respondent refused. McAfee had his wife call respondent in his claim for a one-sixth share of the fee in the Rader case. It is significant that Rader and Dumm gave their depositions at the request of complainants, but they were offered at the instance and request of respondent.

Complainants insist exhibit 6, the letter written to McAfee by respondent dated September 16, 1937, concerning the Patrick case, is sufficient corroboration of McAfee's charges. This letter, it is true, by way of advice, referred to a gentlemanly "approach" in other railroad cases and stated "maybe we can kill a couple of birds at the same time." This, of course, is a letter which never should have been written. It is damaging in its contents and is couched in most injudicious language. This letter, in conjunction with respondent's other correspondence, indicates a course of conduct unprofessional in nature. However, it must be remembered that it was written only a few weeks after McAfee had called upon respondent in an appeal for help and assistance in getting started in business of some kind, and while respondent was contemplating a representation for the Brotherhood of Railway Trainmen. We are not prepared to say it is such a message, under all the circum-

stances and previous close relationship formerly existing between the parties, as will warrant the destruction of this man's professional life.

Complainants insist McAfee is corroborated by Rader, Price, Mrs. Price, and Roy Meyer, father-in-law of Arthur Price. We do not agree. These witnesses at best only corroborate the fact that McAfee called upon them and recommended respondent, stating he was a good lawyer and could get results. These statements are not denied and do not prove the main charge against the respondent or show sufficient collaboration by him to warrant suspension.

The uncorroborated testimony of an investigator, standing alone, is not sufficient to warrant suspension or disbarment. The extent to which corroboration is necessary is for the determination of the court in each case. 7 C.J.S., Attorney and Client, 790, sec. 33c.

We further hesitate to suspend in this case because this renewed relationship was of short duration, it was terminated by respondent himself and such practices have not since been persisted in. The opposite situation obtained in *People ex rel. Chicago Bar Association* v. *McCallum,* 341 Ill. 578, and *In re McCallum,* 391 Ill. 400. The original recommendation in this case was that respondent be disbarred, but this was changed by the commissioners to suspension only. This matter is over ten years old and has been in hearing and in the courts over seven years. The strain upon the commissioners and the respondent has been great and it has been a costly time-consumer for all concerned. We feel, from what we have said here and from the circumstances in this case, that respondent will not again permit himself to become enmeshed in a similar plight. Suspicious circumstances upon uncorroborated testimony of an accomplice are insufficient. *In re Amaden,* 380 Ill. 545.

The punishment to be inflicted by disbarment of an attorney is the destruction of his professional life. Only clear and satisfactory proof can justify a decision from

which would flow consequences of such a grave nature. (*People ex rel. Deneen* v. *Matthews*, 217 Ill. 94.) To justify disbarment the case made must be free from doubt, not only as to the act charged but as to the motive with which it was done. (*People ex rel. Chicago Bar Ass'n* v. *Ader*, 263 Ill. 319.) There are other authorities supporting these propositions but we do not deem it necessary to cite them. The evidence of guilt of the accused with reference to the transactions charged must be clear, and it is not sufficient that the evidence shows a state of facts not entirely creditable to the respondent and the other parties to the transaction.

We think the above principles are applicable and controlling in this case and therefore it will not be necessary to consider the other points of error assigned.

The report of the commissioners will be rejected and the respondent discharged. *Respondent discharged.*

Mr. Justice Wilson, dissenting.