**In re FISHER.**

No. 9815.

United States Court of Appeals
Seventh Circuit.

Jan. 18, 1950.

Rehearing Denied Feb. 14, 1950.

Jay Fred Reeve, Preston Boyden, John S. Miller, Cassius M. Doty, Chicago, Ill., for appellant.

Otto Kerner, Jr., U. S. Atty., John P. Lulinski, Asst. U. S. Atty., Robert B. Johnstone, Irwin I. Zatz, Asst. U. S. Atty., Chicago, Ill., for appellee.

Before MAJOR, Chief Judge, and DUFFY and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This is an appeal by Thomas Hart Fisher, a lawyer (hereinafter referred to as respondent), from an order entered on December 3, 1948, disbarring him from the practice of law in the United States District Court for the Northern District of Illinois, suspending him from such practice, and decreeing that he should not apply for readmission to the bar of that court for a period of three years from the date of the order. The proceeding had its inception in an order entered by Judge John P. Barnes on January 27, 1947, in which respondent was directed to show cause "why he should not be disciplined for his acts and conduct" as attorney in a proceeding then pending entitled "In the Matter of the Estate of George R. Joslyn, Bankrupt, No. 62732." Mr. Robert B. Johnstone, attorney for the Trustee in Bankruptcy, was directed to file specifications of charges against respondent. In the meantime, the matter had been transferred to Judge William J. Campbell. Thereupon, Johnstone filed charges of unprofessional conduct containing 24 specifications. Respondent answered, denying all charges. A trial was had before Judge Campbell, who filed a lengthy opinion which forms the basis for the order appealed from. Specification 17 was dismissed by the court and respondent was found not guilty on specifications 4, 5, 7, 11, 12, 13, 19, 21, 22 and 23, and on portions of 8, 9 and 14. Respondent was found guilty on specifications 1, 2, 3, 6, 10, 15, 16, 18, 20 and 24, and on portions of 8, 9 and 14.

Robert B. Johnstone in the court below conducted the proceeding against respondent. On September 22, 1948, an order was entered by Judge Campbell appointing Honorable Otto Kerner, Jr., United States District Attorney, as additional counsel, and he and his assistants have conducted the proceeding against respondent in this court.

Judge Campbell made no separate findings of fact and conclusions of law but did in his opinion recite in considerable detail the evidence relative to each of the specifications. While we find it difficult to distinguish his findings of fact from conclusions of law, we think this not too important for the reason that there is, with one exception hereinafter noted, little if any dispute regarding the facts, and certainly this is so as to the evidentiary facts. It is in the main the conclusions drawn from such facts which respondent relies upon for a reversal of the order.

In the view we take, we think it unnecessary to enter into a detailed narration of the specifications or the evidence relied upon in their support. The case against respondent is summarized by Judge Campbell as follows: "The gist of the charges of unprofessional conduct resulting from the respondent's actions in the bankruptcy is, first, that respondent's position as attorney for the Elks in the bankruptcy case was in conflict with his position as attorney for Mrs. Joslyn in her marital difficulties with Mr. Joslyn, hinging as they did around the question of support money; second, that respondent attempted to use his position as attorney in the bankruptcy case to effect his real purpose in undertaking the case, which was not to represent the interest of creditors but to compel the payment

of his claim for legal fees as attorney for Mrs. Joslyn; third, that he used his position as attorney for Mrs. Joslyn in the state court to take action nominally on her behalf but actually intended to provide funds for payment to him and that such action was directed against the same funds that respondent in the bankruptcy action was allegedly seeking for the bankrupt's creditors; and finally, allegations of misrepresentation to the bankruptcy court and to Mrs. Joslyn and of false testimony in the bankruptcy case, and charges of disobedience to orders of the bankruptcy court."

In our opinion, too much emphasis has been placed upon isolated incidents, some of them frivolous and of no legal consequence, rather than on a consideration of the entire setting and the over-all picture, which is important in making a fair appraisement of respondent's activities. In clearing the forest the underbrush has been attacked and the trees remain standing. The Joslyn bankruptcy proceeding has been protracted and much ill feeling has been engendered. Of all the numerous lawyers who have appeared in the proceeding, there are few, if any, who have not at some time been charged in connection with their activities in this case with contempt or accused of unprofessional conduct, and in some instances of a serious nature. The proceeding, long pending before Judge Barnes, was subsequently transferred to Judge Elwyn R. Shaw, and even the judges have not escaped the accusation of arbitrary, biased and non-judicial conduct. Even so, we hope to dispose of the matter without undue reflection upon either the bench or the bar.

That the many difficult legal problems posed, together with the combatant attitude of some of the lawyers involved, were sufficient to test the patience of Job can hardly be doubted. And we share the feeling no doubt entertained by members of the court below that this proceeding long ago could and should have been disposed of in a manner consistent with the rights of all parties. However, neither that court nor this was empowered to force a settlement as long as there was a legal question before the court for decision. Every lawyer, and that includes respondent so we think, is entitled to the presumption that he is honest and acting in the best interest of those whom he is employed to represent even though he mistakenly pursues an erroneous course.

In our view, it becomes necessary to review some of the more salient events which have transpired in the long drawn out proceeding from which the instant matter arises. We think this is important in order properly to appraise respondent's conduct which has resulted in his disbarment. This court has heretofore considered and decided three appeals from orders entered in this bankruptcy proceeding. In re Joslyn's Estate, 168 F.2d 803 (hereinafter referred to as the first appeal); In re Joslyn's Estate, 171 F.2d 159 (hereinafter referred to as the second appeal), and Young Trustee v. Handwork et al., 7 Cir., 1949, 179 F.2d 70 (hereinafter referred to as the third appeal). Reference to those opinions will obviate the necessity for a detailed statement of facts here.

George R. Joslyn was adjudicated a voluntary bankrupt February 27, 1936, and obtained his discharge June 29, 1936. He failed to schedule his interest in two trust estates, in each of which he was named as a beneficiary. Subsequently, marital difficulties developed between Joslyn and his wife, Charlotte C. Joslyn, and the latter employed respondent as her attorney. After efforts at reconciliation had failed, respondent filed in the Superior Court of Cook County on behalf of the wife a suit for divorce on the ground of desertion. Joslyn filed a cross-complaint charging adultery. After a bitter and prolonged trial Mrs. Joslyn was granted a divorce for desertion and exonerated from the charges made in the cross-complaint. The divorce decree provided for alimony and support of minor children of $500 per month, which was later substantially increased. The decree made no provision but left open for future consideration the question of Joslyn's liability for respondent's fees earned as attorney for Mrs. Joslyn. In the mean-

time, Mrs. Joslyn and respondent entered into an agreement that the latter's fees and expenses would be paid by her from alimony received in excess of $500 per month, and in conformity with this agreement she executed and delivered to respondent as collateral security an "assignment and power of attorney coupled with an interest." In addition, respondent loaned and advanced Mrs. Joslyn various sums of money and, according to the statement of facts contained in our opinion on the first appeal, there was due and owing respondent in January, 1946, $65,674.22. We need not dwell upon this phase of the situation because no question is raised as to the value of the services rendered by respondent to Mrs. Joslyn or the amount owing him.

Subsequently, respondent learned of Joslyn's voluntary petition in bankruptcy and his discharge and that he had failed to schedule his interest in the trust estates. A petition was filed by respondent as attorney for the Benevolent and Protective Order of Elks (referred to as the Elks), alleging that Joslyn's discharge in bankruptcy was fraudulent and requesting that the proceedings be reopened. The facts and circumstances concerning this proceeding are described in our former opinions. It is here sufficient to note that after a long and protracted hearing before a Special Master to whom the matter was referred, the latter on November 15, 1945 filed a report in which it was found that the bankruptcy proceedings of Joslyn were fraudulent. The Master's report was approved by Judge Barnes on May 20, 1946, and an order was entered reopening the proceedings. Thereupon, the bankrupt filed an amended schedule listing his interest in the trust estates but claiming that they were not property administrable in bankruptcy.

There are other undisputed facts and circumstances relative to the reopening proceeding not shown in our former opinion and which we think are material. Respondent first met, in fact had several conferences, with Mr. Wallace Streeter, a Referee in Bankruptcy, concerning the advisability of initiating the reopening proceeding. According to respondent's testimony, he made a full disclosure of the situation to the Referee, including the relation he sustained with Mrs. Joslyn. Streeter also testified concerning these conferences and in general to the same effect as respondent, although he did not recall all the facts as testified to by respondent. Respondent also conferred with Judge Floyd E. Thompson (formerly of the Illinois Supreme Court) because he knew by reputation that Judge Thompson was one of the leading Elks of the city and that the Elks had a large claim against Joslyn. Again, according to respondent, he made a full disclosure of the situation and laid before Judge Thompson all the facts in his possession. He informed Judge Thompson of his view that the bankruptcy was fraudulent and urged him on behalf of the Elks to initiate reopening proceedings. Judge Thompson informed him that he was busy with other matters and suggested that respondent proceed on behalf of the Elks. He offered to and did introduce respondent to representatives of the Elks, with a recommendation that respondent be employed. Judge Thompson as a witness did not contradict respondent's testimony although his recollection of the conversation was not as specific as that of respondent. At any rate, it is plain that respondent was employed by the Elks on the recommendation of Judge Thompson.

Thereupon respondent consulted with Mrs. Joslyn and explained the bankruptcy situation to her. He advised her she would have to have another lawyer represent her in the bankruptcy case. Mrs. Joslyn consented and employed Charles Ralph Johnston (not to be confused with Robert B. Johnstone, attorney for the Trustee), as her Chicago attorney in that matter. He represented her until June, 1946, when she employed John P. Hampton as her attorney in both the bankruptcy and the state court litigation.

This brings us to the major issue in the instant proceeding, that is, whether respondent's appearance on behalf of the Elks was such unprofessional conduct as to justify his disbarment in view of his prior relation as attorney for Mrs. Joslyn,

and in view of the further fact that he had a financial interest in her claim against the bankrupt. As stated by Johnstone in his opening statement before Judge Campbell, "Briefly the charge against respondent may be summarized as an attempt to obtain a pecuniary advantage for himself by virtue of his position as attorney for the applicant to reopen in case number 62732 in bankruptcy." While of course there are other issues, we think it can be safely stated that they in the main diverge from and are subsidiary to this central issue. In any event, the most serious charge against respondent is that he represented conflicting interests and that he used his position as an attorney for his own financial interest rather than for the interest of either Mrs. Joslyn whom he formerly represented or for the Elks whom he represented in the bankruptcy matter.

Undoubtedly, the overshadowing issue in the bankruptcy litigation was whether Joslyn's beneficial interest in the trust estates or the income from such interest was administrable in bankruptcy. Respondent stoutly maintained that such was the case, and in the early stages of the proceeding singlehanded sought to maintain this contention. He never wavered in this position although in the later stages of the proceeding he was to a large extent crowded out of the picture. On the other hand, the bankrupt and the trustees for the trusts in which he had a beneficial interest just as stoutly maintained that the bankrupt's interest was not administrable and that it did not pass to the Trustee in Bankruptcy. Judge Barnes was often requested, but for some reason refused to make an adjudication of this issue, although in an order entered January 24, 1947 he incorporated in his findings a statement that the interest was administrable. This order is discussed in our opinion on the second appeal. While the record does not disclose, we suspect that Judge Barnes thought that such an adjudication could not be made in a summary proceeding, as was subsequently held by this court on the second appeal.

The proceeding was transferred to Judge Shaw, and his order of June 1, 1948 furnishes the subject matter of the second appeal. On that occasion he set aside and vacated the order reopening the bankruptcy proceeding, held that the Elks was not a creditor of the bankrupt entitled to be heard and that Joslyn's interest in the trusts was not administrable. We reversed this order, holding that he was without authority to vacate the order reopening the bankruptcy proceeding, that the Elks was a proper party and entitled to be heard, and that he was without jurisdiction in a summary proceeding to decide the issue as to whether the bankrupt's interest in the trusts was administrable. At that hearing before Judge Shaw, respondent, although present, did not participate, presumably because of the pendency of the instant proceeding. Johnstone, the attorney for the Trustees and the man who conducted the prosecution of the instant proceeding, appears to have been previously declared insane. Young, the Trustee, requested the court for authority to employ other counsel. This the court refused to grant on the theory, as we understand, that the bankrupt's interest was not administrable in bankruptcy and that the estate was therefore devoid of assets.

From that point, Young as Trustee, without the aid of counsel, carried on the fight. A plenary action was instituted, seeking to recover the bankrupt's interest in the trusts. The court again held that such interest was not administrable and on May 5, 1949 dismissed the cause of action. Young as Trustee appealed and this court reversed, holding that the bankrupt's income from the trusts was property which passed to the Trustee and was administrable in bankruptcy. Thus, this at the present moment is the law of the case on this principal issue, and if our opinion stands it means that there will come into the hands of the Trustee assets sufficient to pay the creditors of Joslyn in full, including the Elks and Mrs. Joslyn, and it is important to remember that this was respondent's contention from the inception.

Great stress is laid upon certain conversations in which respondent participated concerning a settlement or compromise of

the reopened proceeding to show that respondent attempted to effect a compromise for his financial benefit without regard to the rights of the other creditors. We think the record furnishes no substantial basis for this reasoning or conclusion. Respondent no doubt was interested in, as he had a right to be, and sought to obtain what was owing to him, but it does not follow that he attempted to do so at the expense or detriment of other creditors. As already noted, it was his unwavering contention that the bankrupt's interest in the trusts was administrable in bankruptcy and was amply sufficient to pay all creditors. And that position has been vindicated by the recent opinion of this court. We know of no single instance where an offer of compromise was proposed by respondent. Such offers always came from the bankrupt or the trust trustees. First it was $30,000, later increased to $40,000, and still later to $45,000, but always with conditions attached which, while not here material, make it doubtful if they could have been properly approved even had respondent consented. The last offer of $45,000 was deposited with the clerk of the court and when the proceeding was before Judge Shaw he would not even consider a compromise, characterizing it as blackmail, apparently on the theory that there was nothing which the Trustee was entitled to recover from the bankrupt.

These conversations regarding a compromise commenced shortly after the filing of the petition to reopen on May 29, 1944, and continued from time to time until January, 1947. Judge Barnes strongly favored a compromise and carried his insistence to a point difficult to justify. We do not say this in any critical vein, because he no doubt sensed in the beginning what subsequent events have disclosed, that is, that the litigation would be protracted, consuming much time of the court, and that a reasonable compromise would be better for all parties concerned. In fact, we shared his concern, as is indicated by our opinion in the second appeal wherein we stated, " * * * it is clearly shown that both at that time and subsequently the stumbling block in this effort to compromise was Thomas H. Fisher, either in his capacity as attorney for the Elks or for Mrs. Joslyn, or both." [171 F.2d 162] But it must be recognized, so we think, that respondent had as much legal right to oppose as the bankrupt had to offer a compromise or as the court had to favor one. And his strenuous opposition to compromise, aggravating as it might have been at the time, together with his continuous insistence that the assets to which the Trustees were entitled were sufficient to pay all creditors in full, is a convincing circumstance in refutation of the charge that he was representing one client to the detriment of the other, or that he was attempting to secure a financial advantage solely for himself.

While the temptation to review all the evidence in support of the court's conclusion of guilt as to the specifications having to do with respondent's effort to compromise for his own financial gain is great, to do so would unduly prolong this opinion. However, as illustrative and as typical of this category of charges, we shall consider specification 3, which charges: "On to wit, June 17, 1944, and on divers dates thereafter, respondent knowingly and fraudulently, and in violation of his duty as an attorney, attempted to obtain from the bankrupt or from the Trustees of the Joslyn Trusts in excess of $60,000.00 as compensation for attorney's fees in the Joslyn divorce proceedings and other litigation in consideration of acting in his capacity as attorney for the applicant to reopen the bankruptcy case No. 62732 in such a way as to bring about a settlement of such proceedings."

As to the charge contained in this specification, the court in its opinion stated: "The third specification relates to similar attempts made by the respondent on June 17, 1944 and subsequent dates to obtain payment of his fees in the divorce and other litigation from the bankrupt or the Joslyn Trustees. I have already cited respondent's admission that he visited the attorneys for the Joslyn Trustees in June 1944 and that he mentioned the sum of

$200,000 as necessary to settle all of the bankrupt's liabilities. According to the respondent, this statement was in response to a question from Mr. Conerty concerning a settlement; Mr. Conerty's testimony is that respondent suggested that George Joslyn should settle all the claims against him and said that such a settlement would involve a settlement of his fees and expenses in the divorce suit and other litigation. Subsequently, in September, 1944, respondent called Mr. McClory, who was Mr. Conerty's associate, again to suggest a settlement including his own claims. Again, I think that respondent's correspondence with Mrs. Joslyn during this period corroborates this testimony that the respondent was the moving party in the settlement discussions."

We have examined the evidence relied upon in support of this specification and the court's statement is, we think, more unfavorable to respondent than the evidence justifies. It is true respondent admitted that he paid a visit to Conerty and McClory, attorneys for the Trustee of the Joslyn trusts, and informed them of the unfriendly nature of the proceeding and that he hoped that with their presence in the case there would be less difficulty in the future than there had been in the past. He testified that Conerty asked about the amount involved in the bankruptcy and that he replied that it would take $200,000 to clear up all the bankruptcy liabilities, including Mrs. Joslyn's claim. Conerty testified to the same effect and, further, that respondent when asked about a settlement stated that it would have to include "everything," including his fees and expenses, and mentioned an aggregate figure of $200,000. Conerty testified that on a subsequent occasion respondent advised him that his fees would be in the neighborhood of $59,000 or $69,000. McClory testified that Conerty inquired of respondent how everything could be settled and that respondent stated, "It could all be settled for a figure in the neighborhood of $200,000." On cross-examination McClory testified that respondent's reference to $200,000 had to do with the settlement of all the claims against

Joslyn, including the bankruptcy proceeding.

We are unable to discern how the court's analysis of the testimony concerning this incident, or the testimony itself which is even more favorable to the respondent, proves that respondent was attempting fraudulently to obtain anything from the Joslyn Trustees. The evidence plainly shows that the conversation concerning a compromise was the result of an inquiry by Conerty as to how much it would take to settle the matter, and it is equally plain that respondent's position was that it would take $200,000, which included everything. True, this amount included that owing to Mrs. Joslyn and himself, but how that can be held against respondent is not apparent to us. Certainly he was not claiming anything for himself to the detriment of any other creditor, including the Elks and Mrs. Joslyn. If the matter had been settled on the basis of this discussion, the rights of all claimants would have been protected in the same manner as though they each had been represented by separate counsel. We have also examined respondent's correspondence with Mrs. Joslyn referred to in the court's opinion and it supports rather than negatives respondent's position that the only compromise he stood for was one which would pay all creditors in full.

As already noted, there is little dispute as to the evidentiary facts as found by Judge Campbell. The evidence relied upon in support of specification 1 perhaps is an exception. This specification charges in substance that respondent on July 15, 1944 had a conversation with Alvin G. Hubbard, Joslyn's attorney both in the divorce and bankruptcy proceedings, during which respondent, according to the specification, made mention of the fact that the bankruptcy matter could be disposed of by the payment of respondent's attorney fees in the amount of $20,000. That such a conversation took place is categorically denied by respondent. Judge Campbell found that it took place as alleged. Not only was Hubbard's testimony accepted in support of specification 1, but also in support of other charges that respondent testified

falsely in denying that the conversation took place. We doubt if the proof is sufficient to support the finding that the conversation took place. That Hubbard was a hostile witness, biased and prejudiced against respondent, can hardly be doubted. And it must be remembered that this alleged conversation took place shortly after respondent had on behalf of the Elks filed a petition to reopen the bankruptcy proceeding. If it be assumed that respondent had any such notion, he must have completely changed his mind because, as we have shown, he subsequently consistently and continuously insisted that any settlement must be on the basis which would satisfy all of Joslyn's creditors. But even though the conversation took place, Hubbard's version of the same furnishes nothing more than flimsy support for the specification. This is so for the reason that Hubbard did not state in describing the conversation that respondent proposed that he would dismiss the reopened bankruptcy proceedings if his fees and expenses were paid without also insisting that all the creditors be paid in full; in fact, he quoted respondent as proposing settlement of the "whole affair" and the "whole thing." It would seem that his testimony confirms rather than negatives respondent's position that he would not settle or compromise unless all creditors were paid in full.

Judge Campbell with reference to specification 1 states: "The first specification charges (respecting the period with which I am concerned here) that respondent made one such offer to Alvin G. Hubbard, who represented the bankrupt in the divorce proceedings and other litigation, on July 15, 1944, in the courthouse of Lake County, Illinois. Respondent has flatly denied Attorney Hubbard's testimony which states that this conversation occurred on July 21, 1944. Mr. Hubbard's testimony, however, is consistent with respondent's contemporaneous correspondence with Mrs. Joslyn which I have already mentioned, particularly the letter of June 14, 1944 (Pl.Ex. 50C) in which respondent expressed the hope that with the bankruptcy case under

way, it might be possible to effect a full and complete settlement."

While the court refers to certain letters written by respondent to Mrs. Joslyn as "consistent" with the testimony of Hubbard, it appears he relied upon such letters in corroboration of Hubbard. An examination of these letters, however, to our mind furnishes not the slightest corroboration. The only relevant statement contained in Pl.Ex 50C is as follows: "Now that the bankruptcy case is in full swing, there is a bare chance that we will be able to get what we have always been after, i. e., a full and complete settlement." It seems to be the reasoning, although not expressly stated, that by "a full and complete settlement" respondent referred only to the amount due Mrs. Joslyn and himself. Respondent testified, however, that such statement had reference to "a full and complete settlement" of all of Joslyn's liabilities. While the language may be susceptible of either interpretation, it certainly is consistent with respondent's position.

The climax of this more or less continuous effort to force a compromise was reached in January, 1947, in conference between Johnstone (attorney for the Trustee), Conerty and McClory (attorneys for the Trustees of the Joslyn trusts), Joslyn (the bankrupt), and Hubbard, his attorney. It is significant that Young, the Trustee in Bankruptcy, was not invited to, did not participate in, and in fact knew nothing of these conferences until they were subsequently disclosed in court. It was as a result of these conferences that the bankrupt offered $45,000 in settlement of all liabilities. It was this proposed settlement that Judge Shaw characterized as "blackmail." But certainly it was not blackmail on the part of Fisher who was a stranger to this incident or upon the part of the Trustee in Bankruptcy who also was ignored. We need not relate the conditions which were attached to this proposed settlement but it is sufficient to note they were such as to make it doubtful if any court would have approved such proposal even though it had been agreeable to all concerned. This proposal first came to light

on January 23, 1947, when Johnstone announced to Judge Barnes that he as attorney for the Trustee in Bankruptcy had signed a stipulation with Hubbard. This stipulation included a provision for an order reciting that the bankrupt "at all times acted in good faith in these proceedings," and that the bankrupt had "not been guilty of any misconduct" or "of any fraud." Young, the Trustee in Bankruptcy, whom Johnstone purported to represent, testified that he did not know of the stipulation until it was shown him in court, already signed by Johnstone. Young also testified that when he learned of the stipulation he told Johnstone that he would not have signed it because there was a question as to whether it compounded a felony. This was the same Johnstone who was designated by the court to initiate and prosecute the instant proceedings against Fisher.

We have considered other numerous unprofessional acts charged against respondent but are not impressed with their importance. Any weight to which they are entitled is dependent upon the premise that respondent sought a compromise or settlement in the bankruptcy proceeding for his own financial advantage and consequently to the detriment of the bankrupt's creditors. The record, in our view, does not establish such premise and therefore such acts become insignificant.

This is a novel and unusual proceeding. Respondent by his industry and energy not only uncovered and exposed but obtained an adjudication that Joslyn's discharge in bankruptcy was fraudulent. With little assistance and much opposition he sought to cause the bankrupt's beneficial interest in the trusts turned over to the bankruptcy Trustee for administration. On three different occasions either the respondent or the position for which he stood has been vindicated by this court and now, ironically enough, he finds himself disbarred for a period of three years, and this without any finding of evil intent or bad faith, and without proof of injury to any person other than the one who has been adjudicated a fraudulent bankrupt. While the heart of the charges made against respondent is that he acted in a dual capacity for his own financial benefit, not a single word of complaint has been uttered against him, so far as we know, either as a witness or otherwise, by Mrs. Joslyn or her attorneys, or by the Elks or any of its representatives, or by any creditor of the bankruptcy estate.

Much is said concerning the nature and character of proof required in a proceeding of this kind, of the discretion lodged in the court below in determining when a lawyer becomes disqualified to practice his profession, as well as the province of an appellate court upon review. We have read the numerous cases cited, as well as others, and we are of the view that no good purpose could be served in their analysis. The rule to be applied has often been stated by the Supreme Court of Illinois. We shall only cite and quote from the recent case of In re Donaghy, 402 Ill. 120, 83 N.E.2d 560, and the cases therein cited. We do this not because we are bound to follow it but because we approve the reasoning of that court. In that case the court stated 402 Ill. at page 123, 83 N.E.2d at page 562:

"The legal calling is a time-honored profession and the courts owe a duty to protect the public from impositions and improper practices. This duty has repeatedly been declared by this court. People ex rel. Chicago Bar Ass'n v. Lotterman, 353 Ill. 399, 187 N.E. 424; People ex rel. Chicago Bar Ass'n v. Green, 353 Ill. 638, 187 N.E. 811; People ex rel. Chicago Bar Ass'n v. Hansen, 316 Ill. 502, 147 N.E. 431. Such duty, and the manner in which it is exercised, must not be despotic, but the charges must be sustained by clear and convincing proof and the misconduct must be shown to have been fraudulent and the result of improper motives, and the proof must show intent. In re Smith, 365 Ill. 11, 5 N.E.2d 227. The courts must not exercise their supervisory control in an arbitrary manner, but must show a legal discretion in the exercise thereof. In re Lasecki, 358 Ill. 69, 192 N.E. 655.

"The disbarment of an attorney is the destruction of his professional life, his character, and his livelihood. People ex rel. Chicago Bar Ass'n v. Mall, 354 Ill. 323, 188 N.E. 449; In re Lasecki, 358 Ill. 69, 192 N.E. 655; In re Dunn, 370 Ill. 413, 19 N.E.2d 186. The court should, therefore, disbar in moderation. People ex rel. Chicago Bar Ass'n v. A'Brunswick, 315 Ill. 442, 146 N.E. 483. Likewise, the same considerations obtain in the application of a three-year suspension rule. A removal of an attorney from practice for a period of years entails the complete loss of a clientele with its consequent uphill road of patient waiting to again re-establish himself in the eyes of the public, in the good graces of the courts and his fellow lawyers. In the meantime, his income and livelihood have ceased to exist. The courts, however, should not hesitate to inflict the penalty where the punishment is fully deserved."

█ The rule in Illinois, so far as we are aware, is not substantially different from that of other jurisdictions. In Ex parte Secombe, 19 How. 9, at page 13, 60 U.S. 9, 15 L.Ed. 565, a case often cited and relied upon, the court, referring to the power to disbar, stated: "The power, however, is not an arbitrary and despotic one, to be exercised at the pleasure of the court, or from passion, prejudice, or personal hostility; but it is the duty of the court to exercise and regulate it by a sound and just judicial discretion, whereby the rights and independence of the bar may be as scrupulously guarded and maintained by the court, as the rights and dignity of the court itself."

█ We would have little difficulty if this were an original proceeding in determining that the harsh discipline to which respondent has been subjected is not justifiable on the record. This is so notwithstanding the aggravating nature of some of his activities, which perhaps merits criticism. As a reviewing court we recognize, of course, that our function is different but, even so, a careful perusal of the record compels us to the conclusion that the order appealed from is not supported by that clear and convincing testimony which courts generally require in a matter of the instant character. As we said in the beginning, the heart of the controversy does not reside in a dispute as to the evidentiary facts but rather in the conclusions drawn therefrom, and in all deference to Judge Campbell, whom the record indicates gave careful consideration to the matter, we are of the opinion that the conclusions which he reached and upon which his order is predicated are erroneous. In arriving at this opinion, we are not unmindful of the power and duty of the court to protect its honor and dignity from the unscrupulous, but we are likewise cognizant of the duty of the court, as was pointed out in Ex parte Secombe, supra, to protect the rights and independence of members of the bar.

It is, therefore, our judgment that the order appealed from should be reversed, with directions that it be vacated. It is so ordered.